UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JULIE ANN HAPPEL,

        Plaintiff,

        v.

ELI LILLY AND COMPANY,

        Defendant.

CIVIL ACTION No. 04-12218 (WGY)

## Expert Report - Dr. A. Brian Little

**Credentials:**

The current Curriculum Vitae of A. Brian Little, M.D. is attached and incorporated by reference. At trial, Dr. Little will testify to his training, experience, research as set out in the attached CV.

**Expert Opinions:**

Dr. Little will be called to testify about the state of the art on the safety and efficacy of the use of diethylstilbestrol during pregnancy up until the time of plaintiff's birth. Dr. Little's opinions to be testified to at trial to a reasonable degree of scientific certainty include at least the following:

    (1)    The science and medical literature available to experts in the field of obstetrics and gynecology and reproductive endocrinology up to the time of plaintiff's birth indicated that the use of estrogens such as diethylstilbestrol, likely had value for preserving pregnancy particularly in the population of habitual aborters or women with threatened abortion who suffered from estrogen or progesterone deficiency. Equally, experts in the field relying on that scientific data were justified in concluding that the use of DES during pregnancy likely had value with respect to prevention of late accidents of pregnancy in the population of diabetic women who suffered from deficiencies in estrogen or progesterone.

    (2)    The use of DES in the populations described above was based upon the proposition that administration of exogenous estrogens, such as diethylstilbestrol, increased both levels of estrogen and increased production or decreased destruction of progesterone in pregnant women. This proposition was supported by the medical literature and science available to and relied upon by experts in the

field up until the time of plaintiff's birth. Advances in science since the time of plaintiff's birth have further established the fundamental basis of this proposition.

(3)     The science and medical literature available to experts in the field of obstetrics and gynecology and reproductive endocrinology up until the time of plaintiff's birth supported the safety of the use of estrogens, such as diethylstilbestrol for the treatment of certain accidents of pregnancy. The safety of the drug to the women who took it and to their children was accepted by experts in the field because of their knowledge that women and unborn children are known to be exposed to greatly increased levels of estrogen during pregnancy and that the levels of estrogen administered as therapy under the Smith & Smith regimen were designed to maintain the level of estrogen within the parameters of normal pregnancy. Further, the experience of researchers in observing women and their offspring, and reporting on the apparent safety of the drug in the medical literature, supported the conclusion by experts in the field that the administration during pregnancy of estrogens such as diethylstilbestrol was safe. The absence of reports in the medical literature of adverse reactions in women or their children attributable to the therapeutic use of estrogens during pregnancy, up to the time of plaintiff's birth, buttressed the view in the scientific and medical community that this use was safe. The United States Food and Drug Administration had declared in the early 1950's that this use of diethylstilbestrol was "generally recognized as safe" among experts in the field and that conclusion was well supported in the science and medical literature then available.

(4)     Based upon the science and medical literature available to experts in the field of obstetrics and gynecology and reproductive endocrinology up to and including the time of plaintiff's birth, it was reasonable for such experts, and for pharmaceutical companies such as Lilly, to conclude that the use of diethylstilbestrol during pregnancy was both safe and effective.

(5)     The product literature prepared by Eli Lilly and Company concerning the use of diethylstilbestrol during pregnancy comported fully with the medical science available as of the time of plaintiff's birth. The claim that the administration of this drug may have value in certain circumstances was supported not only by FDA approval of the drug for that use but was consistent with the view of experts in the field at that time. References to authors who disputed the efficacy of the drug were noted for the learned intermediary to consider. The warnings and instructions for use were consistent with those that experts in the field of obstetrics and

gynecology and reproductive endocrinology believed were
appropriate and necessary.

(6)     Dr. Little may also be asked for additional, subsidiary opinions, as described in
the report below.  Dr. Little may also be asked to comment upon and testify in rebuttal to any
state of the art evidence that plaintiff may introduce at trial.

**Efficacy of Diethylstilbestrol During Pregnancy:**

(7)     In 1951, Dr. Little began a residency at the Boston Lying-In Hospital, associated
with the Harvard Medical School.  There, Dr. Little studied under and worked with Dr. George
Smith and Dr. Olive Smith, prominent and pioneering researchers in reproductive hormones.  In
the early 1930's, the Smiths had measured urinary estrogen excretion during normal cycles.
They also observed, in a toxemic patient, that the level of excreted estrogen was abnormally low
during this late pregnancy complication and reported that result in the Am. J. of Physiol. 107:128
(1934).

(8)     The Smiths also investigated the levels of excretion of progesterone and recorded
that the levels of a metabolite of progesterone, the only then available measurement for the
hormone, was also lower in patients suffering from toxemia.  This finding was also reported in
medical literature.  J. Clin. Endo. 1:470 (1941).  The Smiths' measurements allowed them to
chart the increasing levels of estrogen during pregnancy.  Other researchers, including Eleanor
Venning, confirmed the findings of the Smiths that estrogen excretion during pregnancy
increased dramatically.  Venning also showed that excretion of metabolites of progesterone also
increased dramatically during pregnancy and that falling levels of estrogen and progesterone
preceded a first trimester abortion.  Am. J. OB/Gyn, 38:927 (1939).

(9)     Because progesterone was then rare and expensive, the Smiths and other
researchers administered estrogen, and later the synthetic estrogen diethylstilbestrol, to pregnant
women at risk for pregnancy loss.  In a series of studies, the Smiths and their associates showed
that the administration of diethylstilbestrol sustained an increased production of progesterone
metabolites.  American J. of OB/Gyn 51:411-415 (1946); West. J. Surg. OB/Gyn 55:313-322
(1947).  From these findings, the Smiths conducted clinical trials in the prevention and treatment
of complications of pregnancy and reported their results in the American J. of OB/Gyn 56:821-
834 (1948).  That study was conducted over a period of six years using patients from the Boston
Lying-In Hospital and from 117 additional physicians, the patients being identified as being
habitual aborters, threatening to abort, or having had a previous miscarriage.  The design of the
study was supported by a biostatistician from the Harvard School of Public Health.  Historical
controls, that is, a comparison of the patient result against the patient's own prior history, was
used in this study.  Among women with a bad prior obstetrical history, the live birth rate
increased from 34% in their prior pregnancies to 75% in the study pregnancies.  The rate of
complication-free pregnancies increased from 9% to 47%.

(10)    The Smiths also published the results of a study of the use of diethylstilbestrol on the progress and outcome of pregnancy comparing treated and untreated primigividas, or women having their first pregnancy. This study, reported in the American J. of OB/Gyn 58:994-1009 (1949) also supported the use of estrogen (diethylstilbestrol) to prevent certain accidents of pregnancy.

(11)    The Smiths summarized all of their data in their last publication on this issue in 1954 in OB/Gyn for (2):129-141. This was a re-evaluation of their data in light of criticism by some other authors. The Smiths, in that reconsideration, reiterated their conclusion that the science and the results of their clinical trials were sound and that unsuccessful attempts by two other authors to replicate their results were due to conducting studies in heterogeneous groups that were not large enough to show a significant difference.

(12)    In addition to the Smiths, other researchers confirmed the underlying theory and clinical results of the Smiths. In diabetic patients, Priscilla White from the Joslin Clinic conducted a number of studies involving the use of diethylstilbestrol in addressing late accidents of pregnancy in her diabetic pregnant population. These studies were also published in peer review journals (e.g., JAMA 115:2039 (1940); and JAMA 128:181-182 (1945) and in a textbook, *The Treatment of Diabetes Mellitus* (1952)). Rosenblum and Melinkoff also tested and supported the efficacy of the use of DES to preserve threatened pregnancies. West. J. Surg. OB/Gyn 55:597-603 (1947).

(13)    In summary, this research into the use of estrogen to preserve pregnancy in the population of women suffering from habitual abortion or threatening to abort and in high risk diabetic patients supported the clinical application of the Smiths' original scientific work measuring estrogen and progesterone excretion during normal and troubled pregnancies.

(14)    Dr. Little, when he encountered this work of the Smiths, was originally skeptical but he personally reviewed the records maintained by Dr. Olive Smith on the large clinical trials and was impressed by the remarkable results there recorded.

(15)    Dr. Little will also testify about the endocrinology of pregnancy in order to help educate the jury as to why the administration of estrogen would, logically and scientifically, help to sustain pregnancy in those cases where there was an indication that difficulties with pregnancy were related to endocrine imbalance, i.e., women who suffered from habitual abortion or threatened to miscarry early in their pregnancy. This discussion will include illustration of the generation of pregnancy hormones from the pituitary, the ovarian follicle, the corpus luteum existing after ovulation, and the placenta.

(16)    Dr. Little will also address criticisms leveled at the efficacy of the use of diethylstilbestrol to maintain pregnancy. In particular, Dr. Little will address the study conducted by Dr. Dieckmann and others and published in the American J. OB/Gyn 66:1062-1081 (1953). That large study, designed to address the use of DES to address late problems of pregnancy, concluded that the study did not support the efficacy of DES for this use. Dr. Little will testify about the reported design of the Dieckmann study, the exclusion of women from the study who would have suffered from or been at risk of accidents of early pregnancy, and the unsuitability of the study design for examining effectiveness of DES in the populations for which

it had value, being women with a history of prior miscarriages (habitual aborters), those threatening to miscarry early in pregnancy, and the high risk diabetic pregnant population. Indeed, Dr. Little was an invited discussant at the presentation of the Dieckmann study and he made many of these points at the time. The Smiths, also invited discussants, also identified the disparity between the population studied by Dr. Dieckmann and the ones in which they had recommended for use of the drug.

(17)    Similarly, Dr. Ferguson and others conducted a clinical trial that did not show any increased effectiveness in preventing late pregnancy complications. Again, this study did not address the use of the drug in appropriate populations to study early pregnancy losses or in diabetic patients.

(18)    The underlying science of the Smiths' was criticized by several researchers, including Davis and Fugo, who questioned whether the Smiths, in their measurement of excreted metabolites of progesterone, were instead measuring the administered synthetic estrogen, DES. In addition to the fact that these authors did not use the same method of analysis as did the Smiths, the Smiths repeated their experiments in light of their criticism and established that their science was correct; the administration of estrogens increased the excretion of progesterone.

(19)    On this subject, later scientists made it clear that the Smiths were completely correct. Research by investigators such as Albrecht and Pepe conclusively show that the Smiths' theory was correct. Estrogens are essential for pregnancy and for the generation by the body of progesterone. Interruption of available estrogen leads to the rapid diminishment of progesterone; restoration of access to estrogen leads the body to create progesterone.

**Safety**

(20)    Dr. Little will testify that, up to the time of plaintiff's birth, experts in the field were convinced that the use of estrogens, including diethylstilbestrol, during pregnancy were safe. Researchers and scientists were aware that levels of estrogen circulating in pregnant women increase dramatically during the course of pregnancy. Researchers and scientists were aware that estrogen crossed the placenta barrier and that the fetus, as well as the mother, was bathed in high levels of estrogen throughout pregnancy. These findings of normal pregnancy made scientists and physicians comfortable that the administration of exogenous estrogens, under a regimen designed to keep the levels of estrogen within the broad band of normal levels in pregnant women, posed no health risk.

(21)    In the early 1950's, the United States Food and Drug Administration declared that the use of diethylstilbestrol during pregnancy was "generally recognized as safe" by experts in the field. This declaration allowed companies to manufacture the drug without submitting a New Drug Application to the FDA but, more relevant here, this conclusion of safety comported fully with the medical and scientific view at the time.

(22)    In addition to this indication of the general view of safety, Dr. Little will testify from his own experience and expertise about the general acceptance among experts of the safety of using diethylstilbestrol during pregnancy.

(23)    A number of careful researchers reported on their experience using DES during pregnancy. These doctors, including some doctors who question the efficacy of the drug, not only had no doubt about the safety of the drug but reported on the lack of adverse effects in the women who took the drug and in their children. Authors including Rosenblum, Lapan, Davis & Potter, Mayer & Lavasseur, Ferguson, Canario, Dieckmann, Plate, Liggett, Crowder, Ross, Robinson & Shettles, Swyer, Sanchez, Pena, Gitman, Harvier, and Priscella White and the Smiths all reported on the pregnancy outcomes of the women involved and on the general health effects of the women and their children. The Canario paper was a more specific follow-up on the health of children born to mothers who took DES and reported no abnormalities.

(24)    Dr. Little, during a part of his residency at the Boston Lying-In Hospital in the early 1950's, studied pathology under Dr. Arthur Hertig. Dr. Little, as part of his studies, examined abortuses from the Boston Lying-In Clinic, including those from women who took DES during pregnancy. Also, pathologic examination of the neonates did not disclose any abnormalities. Similar results were reported by Dr. Potter and Dr. Davis from the University of Chicago in their study of abortuses from women who took DES during the course of the pregnancy.

(25)    This view of the safety of DES during pregnancy continued among experts in the field. As example only, Dr. John Jewett, in the New England Journal of Medicine, 1963, spoke to the use of stilbestrol in pregnancy and reiterated that, in the recommended dosage, stilbestrol is harmless. Well regarded text on pharmacology as late as 1970 also repeated the accepted belief that the use of DES during pregnancy was harmless. See Goodman and Gilman (1970).

**Forseeability:**

(26)    Based upon the above testimony, Dr. Little will testify that the sorts of claims alleged by the plaintiff in this case as a consequence of maternal use of DES were not foreseeable by experts in the fields of obstetrics and gynecology, experts in reproductive endocrinology, and scientists up to and including the time of the plaintiff's birth. To the contrary, the state of the art was that the use of DES during pregnancy was safe. While there was some dispute among researchers about the efficacy of this product, leading practitioners and experts continued to believe, up to the time of plaintiff's birth, that administration of the drug had value in certain populations as indicated by the literature produced by Eli Lilly and Company.

**Lilly's Product Literature:**

(27)    Dr. Little has reviewed the materials prepared by Eli Lilly and Company for use of physicians. It is Dr. Little's view that the indications for the drug as of the time of plaintiff's birth were well supported by the medical literature and scientific data of the time. The statement that the use of DES during pregnancy may have value in certain populations was supported by the scientific and medical literature then available.

(28)    Warnings and instructions for use prepared by Eli Lilly and Company for the use of learned intermediaries also consistent fully with the knowledge of experts in the field of obstetrics and gynecology, reproductive endocrinology, and scientists and researchers in those fields.

(29)    Dr. Little may also be asked to comment upon and rebut any state of the art testimony offered by plaintiff.

_A. Brian Little_

A. Brian Little, M.D.

Dated: _16 December 2004_