UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIE ANN HAPPEL,<br><br>    Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>    Defendant. | CIVIL ACTION No. 04-12218 (WGY) |

## EXPERT REPORT OF DR. KARIN B. MICHELS

### Credentials:

(1)     The Curriculum Vitae of Dr. Karin Michels is attached to and incorporated into this expert report. At trial, Dr. Michels will testify about the training, experience, research and positions set out in that document.

### Expert Opinions:

(2)     Dr. Karin Michels is informed that the plaintiff in this case, Ms. Happel complains of a misshapen uterus, a short stenotic cervix, secondary infertility and the early failure of a spontaneous pregnancy in 2000. Dr. Michels will be called to testify about the epidemiological evidence on *in utero* DES exposure and the conditions that plaintiff claims are related to DES. Dr. Michels' opinions, to a reasonable degree of scientific certainty, include:

   (A)   There is insufficient valid epidemiologic evidence to conclude that uterine abnormalities, noted anecdotally in women whose mothers took DES, are associated with an increased risk of infertility.

   (B)   There is insufficient valid epidemiologic evidence to conclude that there is an association between maternal use of DES and risk of infertility in female offspring.

   (C)   There is insufficient valid epidemiologic evidence to conclude that there is an association between maternal use of DES and the risk of cervical stenosis or cervical shortening in female offspring.

   (D)   In summary, the claims by plaintiff that her conditions are caused by maternal use of DES are not supported by epidemiological evidence of the quality and type that experts in epidemiology would rely upon to conclude that a statistically significant

association exists between use of DES and the risk of those conditions.

(3)   In support of these opinions, Dr. Michels will testify on the subjects listed below. Dr. Michels may also testify to subsidiary opinions as described below, and she may be asked to testify in rebuttal to any epidemiological evidence that plaintiff may offer at trial.

**Uterine Malformation:**

(4)   There is no good evidence that uterine abnormalities in DES-daughters, namely a T-shaped uterus, increase the risk of infertility. Kaufman et al. explored this issue among DES-daughters and found that essentially the same proportion of women with abnormal and with normal HSGs conceived (Am J Obstet Gynecol 1986;154:1312-8). Similarly, Senekjian et al. noted that "[h]ystrosalpingographic findings were not predictive of conception rates among DES-exposed women with primary infertility." (Am J Obstet Gynecol 1988;158:493-8)

**Infertility:**

(5)   Infertility is Ms. Happel's primary complaint. The medical literature that addresses any possible association between *in utero* exposure to DES and infertility has reported inconsistent results. The most recent epidemiologic study that examined the relation between DES exposure and infertility consisting of a sample of women from the DESAD project and the Dieckmann cohort illustrates some of the methodologic problems that are likely to arise in a study on this topic (Palmer JR, et al. Am J Epidemiol 2001;154:316-21). Most importantly, the study relied on self-reported infertility, which was defined as trying to become pregnant for 12 months or more without success. Restricting assessment of infertility to self-reports is particularly problematic if the participant's response is possibly or likely influenced by her exposure status (in this case DES), which would have resulted in an overestimation of the association between DES and infertility.

(6)   Self-reports can be validated by comparison with medical records. This was attempted in the study by Palmer but the validation effort was inadequate. Medical record abstract forms could only be obtained for 46% of participants of the validation substudy (4% of the total cohort), which does not allow inferences for validity. Furthermore, errors in self reported infertility and diagnosis of infertility based on medical records completed by their treating physician would be highly correlated, since it is likely that several of the physician reports were based on self-reports of difficulties to conceive by the patient rather than as the result of a medical examination, making the medical records abstract an insufficient instrument for validation.

(7)   Secondly, willingness to participate in the infertility study was low among the Dieckmann cohort. Women who were exposed to DES may have been more willing to participate if they had reproductive problems (selection bias), which would result in an overestimation of the association between DES and infertility, a problem that was suggested by the authors themselves.

(8)   In addition, this study suffers from possible confounding by other risk factors for infertility, e.g. heredity, which may have led their mothers to take DES in the first place. This

would have created a spurious association. It is of interest to note that infertility due to male factors was 50% higher among DES-exposed. While DES exposure could not have been causally linked to reproductive problems in the male partner, the fertility problems reported by the DES-exposed women were partially explained by reproductive problems of their male partners.

(9) Lastly, the authors also note that DES-exposed women may have been more likely to be evaluated for infertility or to have received a more intense workup than unexposed women and this could have resulted in an overestimation of the relation between DES exposure and infertility. Physicians may also have been more likely to ascribe the infertility of a DES-exposed woman to uterine or tubal factors in the absence of other specific findings.

(10) Other studies on the subject of maternal use of DES and infertility in the female offspring of those women suffer from similar biases. Some of these studies report a difference in self-reported difficulties to conceive, while others do not. Furthermore, it should be noted that the majority of women who were exposed to DES *in utero* are able to conceive and 70%-80% experience a live birth (Stillman RJ. Am J Obstet Gynecol 1982;142:905-21; Sandberg EC, et al. Am J Obstet Gynecol 1981;140:194-205).

(11) One study considered the fecundability among DES-exposed women with abnormal hysterosalpinograms who underwent in-vitro fertilization and found it not different from that of unexposed women (Muasher SJ. Fertil Steril. 1984;42:20-4).

(12) In summary, there is insufficient valid epidemiological evidence from which to conclude that *in utero* exposure to DES is associated with infertility. In the particular case of Ms. Happel, this conclusion is all the more strong in the presence of alternative explanations for her infertility, which Dr. Michels is informed exist.

### Cervical Stenosis and Shortening:

(13) Ms. Happel complains of a shortened and stenotic cervix. Review of the medical literature concerning DES does not disclose any valid epidemiologic evidence that indicates a statistically significant association between cervical stenosis or cervical shortening and maternal use of DES. Senekjian et al. mention cervical stenosis as part of their definition of cervical factors but find "[no] significant difference between in the frequency of cervical factors in the exposed group as compared with the unexposed group." (Am J Obstet Gynecol 1988;158:493-8).

(14) For the reasons stated above, Dr. Michels will opine at trial that there is no valid epidemiologic support that the infertility asserted by this plaintiff is associated with maternal use of DES.

### Early Pregnancy Loss:

(15) Dr. Michels is informed that the early pregnancy loss in this case occurred in 2000, and that plaintiff's physicians characterized the failure as a blighted ovum by about the seventh week of gestation. The most frequent explanation in such a pregnancy loss is a genetic flaw in the fetus. Further, early pregnancy losses are very common; studies indicate that about

one-third of pregnancies detected by elevated HCG fail to survive to delivery. (Wilcox, A.J., et al. NEJM 1988; 319; 189-194).

(16) Dr. Michels is informed that plaintiff's mother had a history of miscarriages and was prescribed DES to prevent further miscarriage when pregnant with plaintiff. It seems reasonable to assume that spontaneous abortions and other pregnancy complications may occur with increased frequency in plaintiff's family.

(17) The medical literature that addresses any possible connection between *in utero* exposure to DES and first trimester pregnancy losses suffer from the same flaws as the literature on infertility discussed above. See, e. g., Kaufman, RH, et al. Obstet & Gynecol 2000; 96:483-489.

**Epidemiology:**

(18) Dr. Michels will also explain to the jury the difference between an association of two events, supported by an epidemiologic study of a population, and a conclusion of cause and effect in a particular case. Population-based epidemiologic studies consider distributions and frequencies of events, which allow the calculation of probabilities of an association between two events. This probability of the two events being associated cannot be inferred to any individual case, i.e. an inference whether two events are causally related in an individual cannot be made. Specifically, based on the results of epidemiologic studies, no inferences can be made whether the same illnesses would have occurred in Ms. Happel had she not been exposed to DES.

(19) In the case of Ms. Happel, Dr. Michels is informed that plaintiff has several "risk factors" for infertility, including smoking (Augood C. Hum Reprod 1998;13:1532-9; Bolmar F. et al. Am J Epidemiol 1996;143:578-587; Stillman RJ, et al. Fertility Sterility 1986;46:545-563; American Society for Reproductive Medicine. Patient's Fact Sheet. Smoking and Infertility 2003), and confirmed endometriosis (Wilson EA. Endometriosis 1987), all of which have been associated with infertility. Each of these factors is likely to be component causes of one or more multifactorial causal mechanisms (Rothman; Epidemiology - An Introduction 2002). Dr. Michels is informed that plaintiff's mother also suffered from and was treated for endometriosis, supporting a familial occurrence of this disorder.

(20) As further support for Dr. Michels' opinion, Dr. Michels will discuss the following aspects of epidemiology in general as well as applicable to this case:

- Recall/Reporting bias: The recall or reporting of an exposure may be influenced by a disease experienced. Participants of a retrospective case-control study who have the disease (cases) may think they were exposed and report having been exposed because they relate their disease to the exposure. Conversely, participants of a prospective study who were exposed may overreport their disease status (e.g. fertility problems, miscarriages) because they relate it to their exposure.

- Selection bias: If individuals participate in a study because they were exposed and have the disease under study, the study results would be

biased and overestimate the association between exposure and disease outcome.

- Detection bias: Physicians may more likely look for or diagnose a disease among patients exposed to a particular factor if this factor has been associated with the disease outcome.

- Inadequacy of self-reported infertility: Self-reported infertility is most commonly defined as trying to become pregnant for 12 months or more without success. This definition of infertility is problematic as it does not account for numerous possible factors that may have influenced the likelihood of becoming pregnant, such as male factors, timing of intercourse, smoking, obesity, etc.

(21)    Dr. Michels will likely make reference to the following additional texts in connection with this discussion of epidemiology:

- Rothman and Greenland. Modern Epidemiology 1998
- Rothman, Epidemiology - An Introduction 2002
- Hennekens and Buring, Epidemiology in Medicine 1987

(22)    Dr. Michels has not testified as an expert witness in the last four years. Dr. Michels is compensated at the rate of $500 per hour for expert consultations.

_____
Karin B. Michels, ScD.

Dated: **January 4, 2005**