**EXHIBIT 5**

Martin Crane, M.D.

1

1      Volume: I

2      Pages: 1 - 32

3          UNITED STATES DISTRICT COURT

4       FOR THE DISTRICT OF MASSACHUSETTS

5               C.A. No. 04-12218-WGY

6

7   JULIE HAPPEL,

8            Plaintiff,

9      v.

10  ELI LILY AND COMPANY,

11

12           Defendant.

13

14

15            **********

16       DEPOSITION OF MARTIN CRANE, M.D.

17          Thursday, April 21, 2005

18          Offices of Dr. Martin Crane

19              571 Main Street

20       South Weymouth, Massachusetts

21              3:10 p.m.

22        Reporter:  Linda M. Grieco

23    Two Oliver Street, Boston, MA 02109

24

Martin Crane, M.D.

6

1    Q.   Doctor, do you have a specialty within the
2  practice of medicine?
3    A.   Gynecology.
4    Q.   Now, doctor, I understand that you treated
5  an individual named Julie Happel at sometime perhaps
6  in 1997 and into 1998; is that correct?
7    A.   That is correct.
8    Q.   Doctor, while I thought that I was going to
9  be in the same room with you and therefore have
10  records with me, do you have your chart for the
11  treatment of Ms. Happel with you?
12    A.   Yes, I do.
13    Q.   Good, thank you.  Doctor, my notes indicate
14  that your first meeting with Ms. Happel was in April
15  of 1997; is that correct?
16    A.   That is correct.
17    Q.   And, doctor, can you tell from your -- well,
18  let me back up.
19          What was the purpose of Ms. Happel's
20  visit with you, this initial visit?
21    A.   Ms. Happel came to see me because she had
22  been trying to get pregnant for two years but had
23  been unable to do so.
24    Q.   Okay.  I take it that at that point in the

Martin Crane, M.D.

8

1    snapshots or snapped records taken during the course

2    of this?

3        A.   Yes, there was a radiologist in the room,

4    and he took x-rays.

5        Q.   Doctor, what was your conclusions about the

6    uterus of Ms. Happel after you had done this HSG?

7        A.   My conclusion was that the uterine cavity

8    was small.  It appeared T-shaped.  The right tube

9    was open, and the left tube I had some question

10   about whether it was patent, because dye did not

11   spill past the corneo portion of the tube.  That is

12   the part that is closest to the uterus.

13       Q.   Now, doctor, let me turn to this T-shape,

14   small and T-shaped reference that you made.  I

15   believe that, that appears in your records, your

16   handwritten notes of May 9, 1997; is that correct?

17       A.   That appears in the records.

18       Q.   Okay.  Now, doctor, when you made the

19   observation that it appeared to be T-shaped, did you

20   have any particular reference beyond the alphabet in

21   mind?  I mean, did that have any broader description

22   to you?

23       A.   The cavity of the uterus looked to be

24   compromised.  I thought that because of the shape of

Martin Crane, M.D.

9

1    the uterus, that there was a possibility of

2    diethylstilbestrol exposure in this patient.

3        Q.  I take it you thought that because you

4    believed that the configuration of the uterus that

5    you were seeing was related to in utero exposure to

6    DES; is that correct?

7        A. - I thought the configuration of the uterus

8    could be a consequence of DES exposure.

9        Q.  Doctor, did you have any conversations with

10   Ms. Happel, your patient, about the conclusions that

11   you drew about her uterus after doing this HSG?

12       A.  Yes.

13       Q.  What did you -- what conversation did you

14   have?

15       A.  Well, I don't recollect the exact nature of

16   the conversation, but it is my usual habit to

17   discuss the hysterosalpingogram.

18             MR. LEVINE:  Excuse me, doctor, this is

19   Mr. Levine.  I'm going to enter an objection.  If

20   you have no recollection of an actual conversation,

21   I think you should say that.

22             MR. DILLON:  I think you should make an

23   objection, if you have one, and you entered one,

24   Mr. Levine, and the doctor can proceed with his

Martin Crane, M.D.

10

1   answer

2            MR. BELLO:  Representing the doctor, the

3   doctor was in the middle of the answer, and I'm

4   going to ask him to please complete his answer at

5   this point.

6       A.  It was my usual and is my usual habit to

7   discuss the hysterosalpingogram immediately, you

8   know, with the patient in the room before the

9   patient leaves the x-ray room.  And I believe that I

10  would have done this.

11      Q.  All right.  Doctor, is it your usual habit

12  or was it your usual habit in 1997 to tell the

13  patient what you saw and the implications of what

14  you saw?

15      A.  I believe that I would have done this at

16  that time.  I also -- well, wait -- I believe I

17  would have done that at that particular time, yes.

18      Q.  Okay.  Doctor, if in fact in May of 1997

19  your conclusion was that it was a T-shaped or

20  compromised uterus that might be due to DES, would

21  all of that, including the association with DES or

22  possible association with DES, be part of your

23  communication to the plaintiff consistent with your

24  usual practice?

Martin Crane, M.D.

11

1    A.  That's quite likely.

2    Q.  Now, doctor, at a later point in 1997, and I

3  believe continuing into 1998, I believe that you

4  prescribed Clomid to Ms. Happel; is that correct?

5    A.  That is correct.

6    Q.  And at least some of those occasions when

7  you prescribed Clomid -- I'm sorry, why did you

8  prescribe Clomid to Ms. Happel?

9    A.  I prescribed Clomid to Mrs. Happel because

10  we were planning to do intra-uterine insemination.

11  And I found that best to determine when the patient

12  is ovulating so that we could do that intra-uterine

13  insemination at an appropriate time by using Clomid.

14    Q.  And, doctor, I take it that during the

15  periods of time when you did do -- excuse me, when

16  you did do IUI, IU -- I'm sorry, let me start all

17  over again.

18        During the time when you were

19  prescribing Clomid, I take it that you then in fact

20  followed through and did intra-uterine insemination;

21  is that correct?

22    A.  That is correct.

23    Q.  Now, doctor, why were you recommending

24  intra-uterine inseminations for this couple, the

Martin Crane, M.D.

12

1  Happels?

2      A.  There appeared to be, after the evaluation

3  that I did, the only abnormality that I could find

4  was the -- within the uterine cavity.  And it is

5  possible that some people will conceive with

6  intra-uterine insemination, and some people will go

7  to term and deliver.  Therefore, having discussed

8  this with her, I felt that intra-uterine

9  insemination was a reasonable course.

10      Q.  Now, doctor, I know we skipped over some of

11  the things that you did with Ms. Happel, but I take

12  it at the time of the IUI, that you had concluded

13  that the uterine abnormality was the major

14  impediment to her infertility; is that correct?

15      A.  Could you repeat the question?

16      Q.  Yes.  Had you concluded by the time of these

17  IUI proceedings with Ms. Happel that the uterine

18  abnormality was the most significant impediment to

19  infertility?

20      A.  It appeared to be so.

21      Q.  And, doctor, at that point did you have a

22  view as to how Ms. Happel had come to have the

23  uterine abnormality?

24      A.  As I had mentioned earlier when you asked me

Martin Crane, M.D.

13

1  this question, I thought that it was a likely and a

2  possible consequence of DES exposure.

3      Q.  Doctor, did you share with Ms. Happel your

4  view that the uterine abnormality was a significant

5  impediment to be overcome if she were going to have

6  children?

7      A.  I believe that we had talked about this, you

8  know, from the time that the hysterosalpingogram was

9  done.

10     Q.  Did you share with Ms. Happel your view that

11  you thought the uterine abnormality was likely a

12  consequence of in utero exposure to DES?

13     A.  As I answered in one of your earlier

14  questions at the time that the hysterosalpingogram

15  was done, I believe that this was discussed with

16  her.

17     Q.  Okay.  Now, doctor, these several attempts

18  at IUI with Clomid stimulation for ovulation all

19  were unsuccessful; is that correct?

20     A.  That is correct.

21     Q.  Did you have any conversations with

22  Ms. Happel on the subject of the lack of success of

23  this technique

24     A.  Yes, we had discussed this, I believe, and

Martin Crane, M.D.

18

1   is ordinary in my history taking with respect to

2   this particular complaint, I ask if somebody knows

3   of any exposure to DES, diethylstilbestrol or

4   infectious process.  At the first visit clearly in

5   my notes, and I know that I take, you know, very

6   straightforward notes, she indicated that -- my

7   notes indicate there was no DES history or pelvic

8   infection or sexually transmitted diseases.  That's

9   in the second sentence of my history.  I know I

10  asked that direct question.  After we did the

11  hysterosalpingogram, and when she came in on May 16,

12  1997, my note says that, in the left-hand side of

13  the page, that there is a DES history.  Although I

14  don't remember the specific conversation, that would

15  indicate to me that I had asked her about it.  And

16  at that particular time, she in all likelihood

17  answered that yeah, now she had checked or knew that

18  she had a DES exposure.

19      Q.  Okay.  So your notes at least indicate,

20  doctor, that by this time of May 16, 1997, both you

21  and Mrs. Happel were aware of a DES history; is that

22  correct?

23      A.  That is correct.

24          MR. LEVINE:  I'm going to object,

Martin Crane, M.D.

19

1   because he's speaking from what an interpretation of

2   a note is.  He has no memory.

3               MR. DILLON:  I think that's the question

4   I asked.

5               MR. BELLO:  He answered the question.

6       Q.  I'm very sorry.  I didn't hear the answer to

7   the question.

8               MR. BELLO:  Did you get the answer?

9               STENOGRAPHER:  The answer was "that is

10   correct."

11               MR. BELLO:  The answer was "that is

12   correct."

13               MR. DILLON:  Thank you very much.

14       Q.  Now, doctor, that being the case, does that

15   refresh your memory at all about any conversations

16   that you had with Mrs. Happel about the DES exposure

17   and the Clomid IUI procedures?

18       A.  I can't remember the specifics of any

19   conversation.  But the change of my notes means that

20   we must --

21               MR. LEVINE:  I object.

22               MR. BELLO:  I object.

23               MR. LEVINE:  That was the question.

24   Your answer is I believe no, you can't remember.

Martin Crane, M.D.

21

1    A.  September of 1997 was the first IUI.

2    Q.  Thank you.  But with reference to those

3  Clomid simulated IUI procedures, would it have been

4  your custom and practice to describe to Mrs. Happel

5  the reasons why you thought the procedures were not

6  successful?

7    A.  In all likelihood, we would have discussed

8  each one, and she made visits during and after each

9  IUI.

10    Q.  Was it your practice and usual custom,

11  doctor, to expand to your patients with your views

12  about all of the factors that might be influencing

13  the adverse effects of a particular procedure?

14    A.  We would have reviewed the factors involved

15  in her inability to conceive, yes.

16    Q.  And again, consistent with that practice

17  that you've just described, would you have included

18  DES in one of the conversations or one or more of

19  the conversations about the failures of these IUI

20  procedures?

21    A.  In all likelihood, yes.

22        MR. DILLON:  Doctor, I think that I have

23  no further questions, and I thank you very much.

24        THE WITNESS:  Thank you.

Martin Crane, M.D.

32

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Linda M. Grieco, Professional Shorthand

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that DR. MARTIN CRANE, the witness whose deposition

7   is hereinbefore set forth, was duly sworn by me and

8   that such deposition is a true record of the

9   testimony given by the witness.

10      I further certify that I am neither related to

11  or employed by any of the parties in or counsel to

12  this action, nor am I financially interested in the

13  outcome of this action.

14      In witness whereof, I have hereunto set my hand

15  and seal this 25th day of April, 2005.

16

17

18

19                      *Linda M. Grieco*

20

21                      Linda M. Grieco

22                      Notary Public

23                      My commission expires

24                      December 15, 2011