# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TAMMY L. REEVES** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | Civil Action No. 03-00237 (RCL) |
| ) | |
| **ELI LILLY AND COMPANY** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## MEMORANDUM OPINION

This matter comes before the court on defendant's motion for summary judgment. Upon consideration of the parties' filings, the applicable law and the facts of this case, this Memorandum Opinion finds that the defendant's motion for summary judgment should be DENIED and that a genuine issue of material fact exists as to the statute of limitations on the plaintiff's discovery of her injury caused by defendant's product.

### I. Introduction

Plaintiff Tammy Lynn Reeves brings a products liability action against defendant Eli Lilly and Company asserting five counts for negligence, strict liability, breach of warranty, misrepresentation, and punitive damages. Specifically, she alleges exposure *in utero* on or about 1970-1971 to the prescription drug diethylstilbestrol (DES). As a result of plaintiff's exposure to DES *in utero*, she allegedly suffered injuries, including, but not limited to, uterine and cervical malformations with resulting infertility as well as physical and mental pain. Plaintiff Tammy L.

Reeves Complaint ("Complaint"), No. 3, 4. Defendant Lilly manufactured, sold, and distributed DES nationwide.[1] This lawsuit was filed on January 17, 2003.

## II. Background

For over three decades, doctors prescribed diethylstilbestrol to nearly five million women in the United States as a way to prevent pregnancy problems such as miscarriage. According to the St. Louis Post-Dispatch of April 3, 1997, "it was called a wonder drug when first developed 60 years ago."[2] But the synthetic estrogen also known as DES didn't work. Instead, according to several news articles published locally and nationally, "DES was linked to reproductive problems and cancers in daughters and abnormalities in some sons of women who took the drug" so reported the Florida Times-Union citing the National Cancer Institute.[3]

Doctors stopped prescribing DES, "after the discovery of a rare reproductive tract tumor in teenage daughters of women who had taken the drug" reported the Patriot Ledger in 1999.[4] Research conducted in 1971 "linked in utero DES exposure to an unusual vaginal and cervical

---

[1] Defendant Eli Lilly and Co.'s Answer to the Complaint ("Defendant Complaint"), No. 2, 8 and Defendant Eli Lilly and Co.'s Memorandum of Points and Authorities in Supporting of its Motion for Summary Judgment ("Defendant Memorandum"), No. 1.

[2] Sue Ann Wood, *Aftermath DES was Thought to be a Wonder Drug,* St. Louis-Post Dispatch, Apr. 3, 1997, at G1.

[3] Marcia Mattson, *Years Later, DES Health Fears Remain,* Florida Times-Union, Mar. 9, 1999, at C1. (Defendant Eli Lilly and Co. state, "[n]umerous lawsuits against DES manufacturers were filed in the 1970s, 1980s, 1990s, and 2000s concerning injuries allegedly caused by *in utero* exposure to DES. The national and local news media has heavily publicized these lawsuits, the injuries allegedly caused by DES exposure, and the alleged wrongdoing of DES manufactures." Defendant Memorandum, No. 19. As evidence of this they cite as Exhibit 7, *Indices of Popular Literature,* a selected number of articles stating this proposition. Some of the news articles included as Exhibit 7 were published in Ohio from 1989-1999 and in Washington State between 1994-1998. Defendant states "knowledge of DES-related injuries and other DES lawsuits was widely available through reported decisions in the popular press." *Id.* at p. 17-18. Therefore defendant concludes, "even if plaintiff had not learned of a connection between DES and her injuries from her doctors or from other DES-exposed women, she could have done so through numerous other sources that were readily available to her." *Id.* at p. 18. Various news articles beyond the defendant's selected list are used as background for the drug DES, to give a complete record of available information to an average news reader. To contrast what defendant cites as "articles regarding DES lawsuits [that] ran throughout the country" (*Id.* at p. 17) the Atlanta Journal-Constitution in 2003 reported that "most cases are settled out of court...despite continuing lawsuits and occasional blips of DES news, the drug is seldom discussed by doctors, public health officials say." Patricia Guthrie, *The Mothers and Daughters of DES...,* Atlanta Journal-Constitution, Nov. 16, 2003, at MS1.).

[4] Kristina Brenneman, *New Warnings about DES/A Second Wave of Cancer May Strike Aging DES Children, and Recent Studies Show Grandchildren May Also Be Affected,* The Patriot Ledger, May 18, 1999, at 17.

cancer" called clear cell adenocarcinoma (CCA), "showing up in young women" reported the Atlanta Journal-Constitution in 2003.[5] Although the drug was banned for pregnancy in 1971 and the "pharmaceutical [company] Eli Lilly removed... DES from the market in the summer of 1997," according to the newsletter "People's Medical Society" published in 1997,[6] "there are fears a third generation of DES babies will be affected" so reported the Sun-Sentinel in 1999.[7] The Florida Times-Union reported in 1999 that, "the National Cancer Institute says there currently is no evidence that grandchildren of women who took DES have higher health risks."[8]

Although there are current medical studies underway to determine a link between initial DES exposure in daughters and to a third generation of female grandchildren, "decades of study on DES have revealed as many as 1 in 1,000 DES daughters may develop CCA, the vaginal/cervical cancer, and that their ability to become pregnant and sustain pregnancies may be impaired," so reported the Atlanta Journal-Constitution.[9] There is a 30 percent risk of breast cancer among mothers who took the drug and making this a complicated issue is the fact that no medical test exists to detect DES exposure, according to this same news article. Because "few clues exist to help anyone figure out whether they are part of the DES generation" the Atlanta Journal-Constitution reported in 2003 that the Centers for Disease Control and prevention spent $1 million in a national public awareness and information campaign "in the hopes of alerting or reminding mothers and their offspring born between 1938 and 1971 of possible health risks."[10]

On or about 1970 and 1971, plaintiff's mother allegedly bought and ingested DES while living in Illinois. Prior to birth, plaintiff's mother took the drug prescribed by her doctor during

---

[5] Patricia Guthrie, *The Mothers and Daughters of DES...*, Atlanta Journal-Constitution, Nov. 16, 2003, at MS1.
[6] *DES: Gone But Not Forgotten*, Newsletter (People's Medical Society), Dec. 1, 1997, at 4.
[7] Ravina Shamdasani, *Hormone DES May Be Behind Some Infertility*, Sun-Sentinel (Ft. Lauderdale Fla.), Apr. 19, 1999, at B1.
[8] Mattson, *supra* note 3.
[9] Guthrie, *supra* note 5.
[10] *Id.*

pregnancy. Plaintiff's mother had been given large amounts of DES following twelve pregnancy losses. The plaintiff states defendant Lilly manufactured the DES she was exposed to in utero. Tammy L. Bennett was born in Illinois on February 26, 1971. (Complaint, No. 3 and Defendant Memorandum, No. 2).

Plaintiff first became aware that her mother took DES during pregnancy in the fall of 1987.[11]   At age 16, Tammy Lynn Bennett consulted an Obstetrician & Gynecologist located in Delaware, Ohio complaining of pelvic pain for several months, progressively getting worse. By the time the plaintiff came to visit Dr. Carolyn Hixson, plaintiff had a history of an "inflamed colon" diagnosed by Barium Enema.[12]   She had also suffered from kidney inflammation, having been examined by an exploratory laparoscopy revealing "scar tissue" in her abdomen.[13]   Dr. Hixson notes in her diagnosis that plaintiff's medical history is noteworthy because her mother took DES during pregnancy, pointing out both her mother and aunt had breast cancer.[14]

Dr. Hixson performed several exams on the plaintiff in October of 1987, including breast, abdominal, pelvic, and cervix exams. Although the breast, abdominal, and pelvic exams were diagnosed as normal, Dr. Hixson stated to Dr. Robert Caulkins, who appears to be plaintiff's family doctor at the time, that "the cervix did show extensive adenosis covering the ecto cervix which would be consistent with the history of DES exposure."[15]   As Dr. Hixson found, "no specific abnormalities were detected which would have contributed to her pain."[16]   At that time,

---

[11] Plaintiff Reeves' Answers to Defendant Eli Lilly and Co.'s First Set of Interrogatories ("Reeves Interrog."), No. 12  at Affidavit of Granberry in Support of Eli Lilly and Co.'s Motion for Summary Judgment, Exhibit 2 ("Defendant Ex."); *see also* Transcript of Deposition of Reeves ("Reeves Tr.") at 56 (Defendant Ex. 3). Defendant asserts that "[p]laintiff became aware of her DES exposure in the early to mid 1980s." Defendant Memorandum, No. 3.  All the evidence cited by defendant contradicts such statement.

[12] Barium Enema is the introduction of a barium salt suspension into the rectum and colon before an X-ray is taken.

[13] A laparoscopy is an examination of the internal organs of the abdomen.

[14] Reeves Medical Records (Letter from Hixon, M.D. to Caulkins, M.D. of 10/28/87) at Defendant Ex. 4 ("Reeves Med. Rec.")

[15] *Id.; see also* Reeves Interrog., No. 15. The "cervix" is the narrow passage at the neck of the womb while "adenosis" is the enlargement of a gland, or the unusual formation of grandular tissue.

[16] Reeves Med. Rec. (Letter from Hixon, M.D. to Caulkins, M.D. of 10/28/87).

4

Dr. Hixson referred plaintiff to Dr. Grant Schmidt, who was an infertility and endocrinology specialist who had a special interest in DES patients. The importance of seeing such a specialist was out of future concerns, "particularly when [Tammy L. Bennett] becomes desirous of pregnancy."[17] Meanwhile, Dr. Hixson treated the pelvic pain conservatively, placing plaintiff on birth control pills and a nonsteroidal antiflammatory agent Motrin.

Several months later, Dr. Schmidt reported back to Dr. Hixson that she had examined the plaintiff referred for antenatal DES exposure.[18] Along with her mother, Dr. Schmidt discussed the various potential problems Tammy could face, especially the vaginal adenocarcinoma findings. Because Dr. Schmidt was concerned that the peak incidence of such finding was between the 16-20 age range, he recommended bi-yearly Pap smear exams and a colposcopy at least once a year.[19] During plaintiff's visit with Dr. Schmidt, they also talked about "vaginal structural abnormalities, uterine and tubal alterations, and the potential difficulties during pregnancy."[20] Dr. Schmidt suggested plaintiff's mother get a mammogram.

Plaintiff continued to suffer from pelvic pain for several months, finally requesting a "definitive diagnosis in the form of diagnostic laparoscopy" surgery.[21] Dr. Hixson informed the 16-year-old Tammy Bennett that she could have a tilted uterus, explaining that the uterus wasn't sitting in the proper normal area in the pelvic region. When asked by defendant's counsel during deposition whether or not that diagnosis could be due to DES, plaintiff answered, "No, [Dr. Hixson] said it was common." (Reeves Tr. at 63) Upon inspection of the pelvic organs, the uterus was found to be entirely normal. The left ovary and fallopian tube, as well as the right

---

[17] *Id.* Defendant Eli Lilly and Co. states Dr. Schmidt was an infertility specialist with an interest in DES patients in the Memorandum for Summary Judgment, No 4, but did not mention Dr. Schmidt was also an endocrinologist, the branch of medicine that deals with endocrine glands disorders.

[18] Reeves Med. Rec. (Letter from Schmidt, M.D. to Hixon, M.D. of 12/30/87)

[19] *Id.* Dr. Schmidt recommended a colposcopy at alternating visits unless a cytologic abnormality was found. Otherwise, plaintiff should have a cervix/endo cervix slide and a 4-Quadrant vaginal smear at each doctor visit.

[20] *Id.*

[21] *Id.* This would be an examination of the internal organs of the abdomen.

fallopian tube, were also normal. According to Dr. Hixson's operative report, "along the right

pelvic side wall, behind the right ovary was found to have several small endometrial implants on

the surface."[22] The uterus, left ovary and both fallopian tube were found to be normal. The

postoperative diagnosis revealed plaintiff's pain had been caused by a stage 1 mild

endometriosis. During the diagnostic laparoscopy, Dr. Hixson used a cautery to seal the infected

endometriosis tissue.[23] It is not clear whether it was before or after the surgery, but Dr. Hixson

explained to Ms. Bennett at that time that *endometriosis could cause a problem in the future*.

Plaintiff recalls Dr. Hixson telling her endometriosis could block the fallopian tubes, preventing

a fertilized egg from going through. (Reeves Tr. at 71)

Several years passed between Tammy Lynn Bennett's endometriosis surgery as a

teenager and her awareness as an adult about lawsuits linking DES to cancer. In 1994, plaintiff

living in Washington State at that time read a local newspaper article about a DES-exposed

woman who had cancer related to DES exposure. (Reeves Tr. at 125*).* Plaintiff called the

attorney who was mentioned in the article several months later to inquire about her own health.

Apparently, plaintiff had gone to the doctor and "had a bad Pap smear, came back abnormal, and

it scared me because my Pap smears up until then were normal."[24] (Reeves Tr. at 126). Rather

than talking with the attorney, Leroy Hersch, plaintiff spoke with his secretary, and a

questionnaire packet was mailed to her.[25] The questionnaire, containing general questions about

---

[22] Carolyn Hixson, M.D. *Operative Report,* Grady Memorial Hospital, Mar. 24, 1988, at Affidavit of Levine in
Support of Plaintiff's Opposition to Defendant Eli Lilly and Co.'s Motion for Summary Judgment, Appendix 6
("Plaintiff App.").
[23] *Id.*
[24] Plaintiff doesn't remember having a follow-up medical checkup to this related bad Pap smear. However, in her
medical records she stated to Dr. Lentz in 1998 that her last Pap smear in 1995 was normal, having yearly Pap
smears up to that time.
[25] Defendant states that plaintiff recalled that this questionnaire "asked a variety of things about pregnancies."
Defendant Memorandum, No. 7. The record actually indicates a question was asked by defendant "what was in the
packet?" which the plaintiff answered, "It asked a variety of things about pregnancies, If I ever had any; even been
diagnosed with cancer, ever—health histories, parent histories." Reeves Tr. at 128.

family and personal medical histories, was mailed back to the attorney. By the time plaintiff

filled out the questionnaire on February 20, 1994, she had been married just over four months.[26]

      Eli Lilly asserts that the twelve-page questionnaire (actually 11 pages) "includes six

pages of questions concerning plaintiff's medical history…5 pages devoted to questions

concerning abnormalities of the reproductive system."[27]  Plaintiff was asked about her menstrual

history, such as "age at onset of period (12 yrs.)" and "any history of spotting between periods

(Yes)" as well as "Irregular menstrual history (Yes) [but] 6 weeks or more between periods

(Don't think so)" and finally "painful, severe cramps (Yes)."  When asked about "Vaginal and/or

Cervical Abnormalities" she answered "yes" to a question regarding "heavy, continuous

discharge" and "possibly" to the question "abnormal lining and/or mucous in vagina?"  When

asked about any surgery, adenosis, treatment for cancer, abnormalities with the cervix or

uterus—including T-shaped uterus and other malformations—plaintiff left the questionnaire

blank. When asked about her ovaries and tubes, such as ovarian cancer, failure to ovulate,

ectopic pregnancy, and tube malformation, she left the questions unanswered.  Plaintiff was also

asked about her pregnancy history.  When asked about the number of pregnancies, neonatal

deaths, live births, still births, and miscarriages, she answered by writing "0" in the blanks.

Otherwise, when asked about spontaneous abortions, infertility problems or labor complications,

the plaintiff left the questionnaire blank.  Finally, when asked about any urinary tract

abnormalities, again the plaintiff left the questionnaire blank.  Although defendant's summary

judgment motion states "questionnaire asks specifically about plaintiff's infertility problems and

the shape of her uterus," defendant failed to mention plaintiff's unanswered portions.

---

[26] The plaintiff filled out the questionnaire as Tammy Lynn Bennett but answered on pg. 5 of the questionnaire that
she had been married since 10/8/1993. *See* Reeves Questionnaire Response to Attorney Hersh at Defendant Ex. 5
("Attorney Questionaire").
[27] Defendant Memorandum, No. 8.

After returning the filled out questionnaire back to the law offices of Hersh & Hersh, Attorney Leroy Hersh mailed Tammy Lynn Bennett (Reeves) back on June 1, 1994 stating he didn't find any immediate problems with the plaintiff that "merit filing a lawsuit on your behalf."[28] The attorney did advise plaintiff that if any additional problems developed in the future, Mr. Hersh suggested Tammy Reeves "contact a lawyer as soon as it is confirmed that they are related to DES"[29] including any other pathology or confirmed infertility problem. Mr. Hersh also suggested that plaintiff gather together her mother's gynecological records.

Plaintiff did not see any doctors or get an annual medical checkup until October of 1998 when she began her visits with Dr. Gretchen M. Lentz, plaintiff's attending physician at the Department of Obstetrics & Gynecology at the University of Washington Medical Center in Seattle, Washington. The plaintiff obtained Dr. Lentz's name through a DES hotline. At that time, she belonged to an online women's support group by the time she visited Dr. Lentz.[30]

The reason for her initial visit was "to get a thorough DES exam and some questions answered."[31] Some of the problems she listed on the "History Form" included arthritis, kidney and bladder problems, thyroid, and bowel problems. She informed Dr. Lentz that her past surgeries included an endometriosis/laparoscopy and a severe kidney infection. She also wrote down all the medical information previously described, including her mother's talk at age 13 about plaintiff being a DES baby and *being told she had a T-shaped uterus, or "tilted."*

The medical resident who initially examined the plaintiff, Dr. Kristen Whiting, listed under the significant problems/diagnosis section, the major reasons and recurring problems as to the plaintiff's visit: 1) endometriosis, 2), irritable bowel, 3) DES exposure in utero, and 4)

---

[28] Letter from Hersh to Bennett, June 1, 1994 at Defendant Ex. 6.
[29] *Id.*
[30] Defendant Memorandum, No. 11, 12, 15.
[31] Reeves Med. Rec., *Women's Care Center: History Form*, Univ. of Wash. Med. Ctr., 10/12/98.

infertility.[32]  When discussing her DES exposure, the doctor wrote down plaintiff suffered from

bi-monthly periods, with lots of bleeding and pain.  When discussing her concerns about

infertility, the medical records show this was a concern related to her previous problems of

endometriosis.  Although plaintiff informed Dr. Lentz that previous doctors told her she had a T-

shaped uterus, Dr. Lentz wrote down in her medical notes how plaintiff could know "such a

thing since she never had an HSF (hysterosalpingogram, an ex-ray study of the uterus)."[33]

Plaintiff argues she was "told that she had a tilted uterus and wrongly believed that a T-shape

uterus was a tilted uterus."[34]  According to Dr. Lentz's medical examination notes, plaintiff's

uterus was normal in size, shape and contour.[35]  The doctor's medical assessment and plan for

the patient's first visit on October 12, 1998 is as follows:  1) for the DES exposure concern, the

doctor obtained a Pap smear with a 4 quadrant sampling; 2) for the plaintiff's endometriosis

concern, the doctor questioned whether this could be a recurring endometriosis problem, perhaps

an enlarged left ovary.[36]  Dr. Lentz discussed with the patient several treatments to her menstrual

pain and abnormal bleeding possibly related to endometriosis.  The doctor writes in her notes

that the patient (plaintiff) was going "to think about whether to have infertility work up versus a

normal treatment (using Lupron or oral birth control pills) versus surgical treatment, to check if

she possibly suffered from an enlarged ovary.[37]

---

[32] *Id.*

[33] Plaintiff's Opposition to Defendant Eli Lilly and Co., Motion for Summary Judgment ("Plaintiff's Opp."), No. 3
[34] *Id.* ("The plaintiff had never had an examination of the inside of her uterus either by x-ray or by scope. There is
no way in this world that she could have known that her uterus had the T-shape associated with DES.  She thought
the 'T' meant 'tilted'."); *but see* Defendant Memorandum, No. 12 ("On her intake form, plaintiff reported that she
was a 'DES baby.' Immediately underneath this she wrote 'told T-shape uterus, tilted.' Dr. Lentz's notes about
plaintiff's history repeat this diagnosis of a T-shape uterus.").
[35] Reeves Med. Rec., *Progress Notes,* Univ. of Wash. Med. Ctr., 10/12/98 at PL 2910; *see also* Plaintiff's App. 3.
[36] *Id.*
[37] *Id.* at PL 2909

Dr. Lentz wrote in her notes that the plaintiff "doesn't want OCP's (oral contraceptives) [because she] desires pregnancy."[38]  Plaintiff began to think she might have a problem getting pregnant when she went to see Dr. Lentz.[39]  However, the doctor offered to refer the plaintiff to a specialist for an infertility evaluation, "to help me with possible infertility problems because of the titled uterus and endometriosis exposure."[40]  Defendant states in its Memorandum that by the time plaintiff went to see Dr. Lentz, "she had been having intercourse with her husband for five to six years without birth control and had never become pregnant."[41]  However, plaintiff states she had intended and started trying to get pregnant a year before her visit with Dr. Lentz.[42]

A few weeks after her visit with Dr. Lentz in 1998, Tammy Reeves went to see Dr. Bozich who checked her thyroid with blood work.  It appears from Dr. Bozich's medical notes that the plaintiff had two complaints: 1) nausea, vomiting, and diarrhea as well as 2) a two to three month history of increased fatigue and decreased fatigue.[43]  The lab results however were OK and showed plaintiff was not suffering from anemia.  Plaintiff spoke with Dr. Bozich about the medical diagnosis performed by Dr. Lentz, including "my cervix was out of—severely tilted, it's attached to [my] uterus."[44]  These abnormalities were discussed in the context of DES. Plaintiff told Dr. Bozich that according to Dr. Lentz, these abnormalities were not related to DES.[45]  Dr. Bozich wrote in the medical records, "[a]pparently [plaintiff] has bicornuate uterus

---

[38] *Id.* at PL 2910.
[39] Defendant Memorandum, No. 13; *see also* Reeves Tr. at 75.
[40] Reeves Med. Rec., *Progress Notes* at PL 2910; *see also* Reeves Tr. at 76.  There was a discrepancy in the record as to what the plaintiff told defendant's attorney about the reason why Dr. Lentz referred her to an infertility specialist.  Defendant Memorandum states "Dr. Lentz offered to refer plaintiff to someone to help with the infertility because of the shape of her uterus and *her DES exposure.*"  However, as the plaintiff's transcripts shows at 76, the plaintiff actually testified that Dr. Lentz offered to "refer me to someone who could…help me with possible infertility problems because of the titled uterus and *endometriosis exposure.*"
[41] Defendant Memorandum, No. 13.
[42] Reeves Tr. at 75.
[43] *See* Reeves Med. Rec., at PL 2607.  The doctor notes that plaintiff denied any feelings of depression, thoughts of self harm or suicide.
[44] Reeves Tr. at 80.
[45] *Id.*

and some of the cervical and ovarian anomalies are related to this."[46] Dr. Bozich's records note

that plaintiff's medical history "was significant for her mom's DES exposure while she was in

utero."[47]

Dr. Bozich also wrote in plaintiff's medical record that plaintiff "belongs to a [DES]

women's support group over the Internet."[48]  Apparently, Dr. Lentz told plaintiff that, "there was

an on-line chat room" that she could find out about other DES exposed women.[49]  Plaintiff

visited the DESlistserv but did not participate through e-mail or chatrooms. Rather, she "read

the weekly posting, but I did not contribute because most of the time they are just talking about

menopause and third-generation and stuff that doesn't relate to me."[50]  Plaintiff admits she read

on the DESlistserve in 1999 about other DES-exposed women having infertility problems.

Tammy Reeves continued her annual checkups with Dr. Gretchen Lentz in the following

years.  On December 20, 1999, plaintiff visited Dr. Gretchen complaining of severe pains and

cramps in the lower abdomen. As Dr. Gretchen stated in her medical records, "[plaintiff] does

have a history of endometriosis." [51] Plaintiff had been trying to avoid oral birth control pills and

a drug called Lupron "because she has been infertile and is still trying to get pregnant.[52]  Instead

she was taking a drug called ketoprofen to help with the pelvic pain. While it did help

somewhat, it often resulted in a heavy period.  Dr. Gretchen suspected the dysmenorrheal and

related pain was caused from cervical stenosis. Dr. Gretchen prescribed Vioxx to replace the

ketoprofen.  If this did not help, Dr. Gretchen suggested plaintiff "needs to return for a cervical

---

[46] Reeves Med. Rec., at PL 2607. Bicornuate uterus is a uterus that has two horns and a heart shape.  A bicornuate uterus is the most common congenital uterine anomaly and can impact a woman's reproductive capabilities. *See* http://www.ivillagehealth.com, last visited on Nov. 11, 2004.
[47] Reeves Med. Rec., at PL 2607.
[48] *Id.; see also* Defendant Memorandum, No. 15.
[49] Reeves Tr. at 130.
[50] *Id.*
[51] Reeves Med. Rec., *Clinic Note*, Univ. of Wash. Med. Ctr., 12/20/1999 at PL 2924.
[52] *Id.*

dilation" to get a Pap smear. [53]  *Bimanual exams showed a normal sized uterus which was mobile and nontender.*  Dr. Gretchen noted plaintiff "had infertility for 10 years…I offered them a referral to the FEC Clinic next door and they are going to check on their insurance coverage."[54]

Another health concern for Tammy Reeves in December of 1999 was a lump in the right breast that had appeared two months prior.  Although the lump was small, plaintiff wanted it checked, because as Dr. Gretchen noted, "she is DES exposed."[55]  Dr. Gretchen told plaintiff to check the breast lump monthly and if there were any changes, she'd want to get a mammogram and a breast ultrasound. Dr. Gretchen wrote as a review of systems:  "Positive for DES exposure and a prior ascus Pap which was repeated in February 1999 and was normal."[56]

One year later in December 2000, plaintiff underwent a hysterosalpingogram ("HSG") to examine her uterus.[57]  Dr. Gretchen had suggested plaintiff get an HSG "to see if the endometriosis was blocking my tubes" because she desired to get pregnant. [58]  The results of the HSG showed her tubes were "fully open and I had a T-shaped uterus."[59]  The person performing the HSG showed the plaintiff what the inside of her uterus looked like through a monitor and explained at that moment what a T-shaped uterus looked like.  The physician explained "that this was a classic sign of DES exposure and that I may have a problem carrying a pregnancy."[60]  Plaintiff was told one of the impacts of a T-shaped uterus was "that during pregnancy that I might have a miscarriage because the T-shaped uterus would not expand like it should."[61]

---

[53] Reeves Med. Rec., *Clinic Note*, Univ. of Wash. Med. Ctr. 12/20/1999, at PL 2926. ("Clinic Note")
[54] *Id.*
[55] Reeves Med. Rec., *Clinic Note* at PL 2924.
[56] Reeves Med. Rec., *Clinic Note* at PL 2925.
[57] Defendant Memorandum, No. 18.
[58] Reeves Tr. at 84.
[59] *Id.*
[60] *Id.* at 85.
[61] *Id.* at 86; *see also* Defendant Memorandum, No. 18.

Plaintiff Tammy Lynn Reeves (formerly Tammy Lynn Bennett) filed this lawsuit in the District of Columbia on January 17, 2003. Defendant Eli Lilly and Company argue they are entitled to summary judgment as a matter of law because plaintiff's claims are barred by the applicable statute of limitations. Defendant's memorandum for summary judgment argued plaintiff was aware that her infertility was attributable to DES three years prior to filling suit.

## II. Standard of Review

A court may dispose of a case on summary before trial only when examination of the record as a whole reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must inquire whether "there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Before trial, a party must be able "to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In examining the record, the court must view all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, Rule 56 also requires the non-moving party to "go beyond the pleadings by [entering evidence] showing there is a genuine issue for trial." 477 U.S. at 324. If the moving party proves no genuine issues of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt" as to an issue for trial. Where the record taken as a whole could not lead a trier of fact to find for the nonmoving party, there is no genuine issue for trial. 475 U.S. at 586.

13

### III. Discussion

#### A. Elements for the Discovery Rule

Product liability claims in the District of Columbia must be brought within a three-year period of limitation "from the time the right to maintain the action accrues." D.C. Code § 12-301(8) (2001). *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998). In order to determine when the statute of limitation commences, the parties agree that a three-prong "discovery" rule applies to this action under District of Columbia law, although the parties dispute when all the elements for the rule became actionable. Where the discovery rule is applicable, in order for the cause of action to accrue, "one must know (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of some evidence of wrongdoing. *Bussineau v. President and Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986). The "discovery rule" determines when "the clock begins to tick" on the statutory three-year limitation. *Albers v. Eli Lilly and Co.*, 257 F. Supp. 2d 1147, 1149 (N.D. Ill. E.D. 2003), *affirmed*, 354 F.3d 644 (7th Cir. 2004) (C.J. Easterbrook) *per curiam*.

As the court in *Bussineau* stated, "a cause of action is said to accrue at the time injury occurs." *Bussineau*, 518 A.2d at 425. However, in reconfirming its decision in *Bussineau* per curiam, the District of Columbia Court of Appeals noted the discovery rule applies in cases "where the relationship between the fact of injury and the alleged tortuous conduct is obscure when the injury occurs," some evidence of wrongdoing may be required. *Diamond v. Davis*, 680 A.2d 364, 379, 380 (D.C. 1996) quoting *Bussineau*, 518 A.2d at 425; *See also, Burns v. Bell*, 409 A.2d 614, 617 (D.D.C. 1979); *Kelton v. District of Columbia*, 413 A.2d 919, 921 (D.C. 1980); *Jones v. Rogers Memorial Hosp.*, 442 F.2d 773 (D.C. Cir. 1971); *Grigsby v. Sterling*

14

*Drug, Inc.* 428 F. Supp. 242, 243 (D.D.C. 1975), *aff'd* 543 F.2d 417 (D.C. Cir. 1976), *cert*

*denied*, 431 U.S. 967 (1977); *Dawson* v. *Eli Lilly and Co.*, 543 F. Supp. 1330 (D.D.C. 1982).

 The court in *Diamond* furthered the discovery rule by establishing the "inquiry notice"

standard of "some evidence of wrongdoing" and adopting an objective standard of care of actual

or inquiry notice with a duty on the plaintiff to investigate:

> [M]atters affecting her affairs with reasonable diligence under all of the circumstances.
> Once the plaintiff actually knows, or with exercise of reasonable diligence would have
> known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is
> bound to file her cause of action within the applicable limitation period, measured from
> the date of her acquisition of the actual or imputed knowledge.

*Diamond*, 680 A.2d at 381. "Actual" and "inquiry" notice in tandem refer to the start of the

limitations period for a cause of action. Either notice acquired by the plaintiff at a particular time

will be a question of fact. However, "once either actual or inquiry notice is present...the statute

of limitations begins to run as a matter of law." *Id.* at 372. *See also Albers v. Eli Lilly and Co.*,

257 F. Supp. 2.d at 1151. ("Inquiry notice is 'that notice which a plaintiff would have possessed

*after* due investigation.' Reasonableness is of course a wholly objective standard."), *quoting*

*Diamond*, 680 A.2d at 372. (emphasis added by the court), *affirmed* 354 F.3d 644, 645 (7th Cir.

2004) ("The line of [plaintiff's] argument, if adopted, would effectively abolish the D.C.

objective rule allowing the imputation of evidence that would have been gathered from a

reasonable search and would convert the standard to an entirely subjective one.").

 As the court in *Bussineau* pointed out, it was Judge Joyce Hens Green in *Dawson* who

analyzed previous decisions by the District of Columbia Court of Appeals to resolve the issue of

when a cause of action accrues under the discovery rules. *Bussineau*, 518 A.2d at 426, 428;

*Dawson*, 543 F. Supp. at 1333. Exactly what are the facts discovered, or by the exercise of due

diligence should have discovered, that give rise to a claim had not been precisely defined in the

District of Columbia. As Judge Green pointed out, each case, *supra*, "appears to refer to the elements of the cause of action which were belatedly discovered under the particular circumstances." *Id.* So, for example, in *Jones v. Rogers Medical Hospital*, the statute of limitations began to run when the injury caused by the surgery was discovered. Judge Green pointed out the court in *Kelton v. District of Columbia* considered the plaintiff's discovery when the wrongdoing was found. The court in *Burns v. Bell* held that the time of discovery was a jury question "where a plaintiff knew that her injuries were caused by defendant's surgery, but claimed to have believed for several years that they were a natural or usual after-effect of the surgery." *Id.* Finally, Judge Green pointed out that "the discovery rule as applied to a drug products liability action" when it comes to causation was cited by the court in *Grigsby v. Sterling Drug, Inc.* stating "the statute of limitation on each of the causes of action begins to run from the time plaintiff learned, or in the exercise of due diligence could have learned, that her injuries were not simply misfortune." *Grigsby,* 428 F. Supp at 243; *Dawson,* 543 F. Supp. at 1334.

After citing several cases, Judge Green set out three different factual situations that may arise in situations where the injury first occurs, but the plaintiff may not have enough information to bring a suit:

> 1) Where the injury is latent, the claim is held not to accrue until the plaintiff discovers the injury; 2) Where causation of an injury is unknown, the action accrues when both the injury and its cause have been (or should have been) discovered; 3) Where the injury and causation are known, but not that there has been any wrongdoing, the action is held to accrue when the plaintiff discovered, or by due diligence should have discovered the wrongdoing.

*Dawson* at 1338. Judge Green stated that she "believed the District of Columbia courts would follow this progression." *Dawson,* at 1338; *See Diamond,* 680 A.2d 364, 379 (D.C. 1996) ("It is inconsistent with notions of justice to interpret accrual to occur before the plaintiff would reasonably know of any wrongdoing."); *Grant v. Schering Corp.,* 837 F. Supp. 869, 872

16

(S.D.Oh.W.Div. 1993) ("The Ohio Supreme Court ...concluded the discovery rule in DES cases should provide 'an opportunity for remedy at a meaningful time and in a meaningful manner'.")

The District of Columbia Court of Appeals agreed with Judge Green that various cases interpreting the discovery rule "may not have parsed the issue with clarity and precision" and the court also agreed with one of her three factual situations—that the District of Columbia courts would adopt the "some evidence of wrongdoing" rule. *Bussineau* at 428.[62] In most cases "injury, causation and fault are apparent at the time of the occurrence." *Dawson* at 1138. There will be rare cases in which one or more elements for a cause of action may not be evident at once. In many cases, the court in *Diamond* pointed out "knowledge of the cause in fact of an injury will be tantamount to knowledge of tortuous conduct...[but cases] where the injury and cause-in-fact do not themselves provide evidence of negligence, particularly when the professional reassures the lay client or patient that all is well," will be more difficult and rare. *Diamond*, at 379. This is one of those difficult and rare cases.

**B. Plaintiff raises genuine issues of material fact**

**1. One must know, or by reasonable diligence should know of injury**

Plaintiff claims that her infertility injury was caused by her DES exposure in utero and she was made aware of this wrongdoing when an examination of the inside of her uterus revealed a T-shaped uterus as a classic sign of DES exposure. Defendant argues that plaintiff knew of her injuries more than three years before filing suit. (Defendant Memorandum, pg. 7). Although plaintiff's medical records state that she had been diagnosed with infertility for over ten years at

---

[62] *Contra Albers v. Eli Lilly and Co.*, 257 F. Supp 2d 1147, 1150 (N.D. Ill.E.Div. 2003) ("Judge Joyce Hens Green's rejection of summary judgment on statute of limitations grounds is two decades old, and the massive and highly publicized developments that have taken place in the field in the interim render that case's analysis of the due diligence issue very much out of date."), *affirmed* 354 F.3d 644, (7th Cir. 2004) (C.J. Easterbrook), *per curiam*. However, while the district court criticized Judge Green for her analysis of due diligence, the D.C. Court of Appeals in *Bussineau*, quoted extensively in *Albers*, adopted and affirmed Judge Green's approach to the "some evidence of wrongdoing" element under the discovery rule. The Seventh Circuit also applied the "some evidence of wrongdoing" element cited by *Bussineau* and affirmed in *Diamond*.

the time of her visit with Dr. Gretchen, her infertility problem was not attributed to DES. Rather, plaintiff's doctors kept telling her the infertility was caused by endometriosis. Plaintiff's medical records show a dual path for her medical treatment: 1) doctors were concerned that cancer could develop because of plaintiff's DES exposure in utero; 2) doctors treated plaintiff's endometriosis as a teenager, and later, medical experts advised her a recurring problem would be troublesome if she desired to get pregnant.

Defendant points out that plaintiff stated to her doctor she had a T-shape uterus prior to three years before filing a lawsuit. While plaintiff subjectively argues she believed a titled uterus diagnosis was the same as a T-shaped uterus, the record demonstrates Dr. Lentz's medical notes raise doubt as to how plaintiff could assert that she had a T-shaped uterus. Prior to her x-ray study of the uterus in December 2000, the medical records don't show a previous hysterosalpingogram examining the inside of her uterus. Both Dr. Hixson in 1988 and Dr. Lentz in 1998 and 1999 diagnosed plaintiff's uterus as "normal." Although Eli Lilly and Company state the first prong of the District of Columbia discovery rule is satisfied because she knew of her infertility problem, a genuine issue of material fact exists as to whether plaintiff objectively linked not being able to have a baby with being a DES baby until December 2000.

### 2. One must know, or by reasonable diligence should know of its cause in fact

Defendant argues plaintiff knew her infertility injuries were caused by her DES exposure. Although plaintiff kept asking the treating physicians whether being a DES baby had anything to do with her infertility, the evidence in the record demonstrates the medical experts were concerned plaintiff's infertility was do to her endometriosis diagnosis rather than DES exposure. According to plaintiff's deposition, it was Dr. Hixson who first told her that the endometriosis could cause infertility problems. Ten years later when plaintiff discussed with Dr. Lentz any

impact DES could have on plaintiff's ability to get pregnant, plaintiff testified in her deposition that Dr. Lentz said the infertility problems was due to plaintiff's endometriosis and her "tilted uterus and that DES wasn't the cause of it." (Reeves Tr. at 71, 72)  Dr. Lentz's medical citations, regarding endometriosis and infertility, demonstrate her concerns to be in tandem.

As Judge Easterbrook pointed in *Albers v. Eli Lilly*, a plaintiff has an objective duty of care to investigate and find some evidence of wrongdoing.[63]  The plaintiff in that case, Katherine Albers, had been diagnosed in 1991 "with a malformed uterus that the physician attributed" to DES embryonic exposure. Albers argued she became aware of "some evidence of wrongdoing" between 1999 and 2000 by reading a newspaper, although her injury and its cause had been diagnosed nearly a decade prior as having a "classic T-shaped DES exposed uterus." *Id.* at 645. Judge Easterbrook found a reasonable jury would conclude that a person with a serious medical condition, such as having a T-Shaped uterus injury rendering her infertile and knowing its cause, "would investigate to learn whether wrongful conduct played a role." *Id.* at 645.

That case is distinguished from the pending litigation in three ways: 1) the injury in *Albers* was a T-shaped uterus, 2) a medical expert made the plaintiff in *Albers* aware of her injury and its cause nearly a decade prior to filing her case, 3) the issue before Judge Easterbrook on appeal was whether plaintiff conducted a modest investigation of wrongdoing.  In this case, Tammy Reeves linked her infertility injury to a cause and wrongdoing, when doctors discovered a T-shaped uterus through an x-ray and then told her a malformed uterus "was a classic sign of DES exposure." (*Reeves Tr.* at 85, Defendant Exhibit 3).  All along Tammy Reeves, while investigating any possible cancerous developments in her body due to DES, relied on information by her doctors when told her injury, infertility caused by endometriosis, was an unfortunate occurrence.  Doctors diagnosed her uterus several times as being normal.  According

---

[63] 354 F.3d 644 (7th Cir. 2004)

to plaintiff's deposition, the reason why doctors recommended she have an HSG was "to see if the endometriosis was blocking my tubes." (Reeves Tr. at 84, Defendant Exhibit 3).

### 3.  One must know, or by reasonable diligence should know of evidence of wrongdoing

Next, defendant states plaintiff "knew of her infertility and had heard from at least several sources that her injuries were related to her DES exposure." (Defendant Memorandum, at 9). Plaintiff was told that because of her DES exposure she potentially would have difficulties during pregnancy, but this was in the context of possible cancerous developments. Although one attorney did mention to plaintiff that infertility problems could be related to DES exposure, various physicians kept telling her the infertile problems were most likely caused by endometriosis. Finally, plaintiff had joined a women's DES support group over the Internet by 1999 where she read other women's experience and response to DES. While defendant states plaintiff read about women's problems with uterine abnormalities and infertility, plaintiff counters that she did not pay much attention to such online discussions. A reasonable juror could reach a conclusion that plaintiff attributed DES exposure to cancerous developments while she trusted doctors when they told her the infertility was simply a misfortune of her endometriosis and therefore a genuine factual issue.

Defendant Eli Lilly argues plaintiff knew she could sue DES manufacturers for her DES-related injuries more than three years before she filed suit. It is true that plaintiff sought legal advice as to her chances of filing suit for her DES exposure in utero. However, plaintiff says she began her inquiry because she read a newspaper story about women who suffered from cancer because of DES. When she filed her initial paperwork with the attorney, she left most of the inquiries blank because more questions dealt with cancer exposure than with infertility problems. Although defendant states that, "plaintiff clearly understood by 1994 that an individual suffering

from DES-related injuries could assert a claim against the manufacturer of DES," plaintiff would first have to know the infertility injury was caused by DES. Defendant concludes that "even if plaintiff had not learned of a connection between DES and her injuries from her doctors or from other DES-exposed women, she could have done so through numerous other [news] sources that were readily available to her." As the record shows, *supra*, various newspapers and one health agency have concluded most Americans remain in the dark about the consequences of DES. A reasonable juror can conclude that a genuine factual dispute exists as to when plaintiff exactly discovered her infertility injury was caused by DES exposure in utero through due diligence.

A reasonable juror could also conclude that plaintiff all along was concerned about cancer developments due to DES exposure. As far as plaintiff knew, her infertility problems were attributed to her endometriosis. This situation that plaintiff faces is more aligned with Judge Green's second factual situation which states: "where causation of an injury is unknown, the action accrues when both the injury and its cause have been (or should have been) discovered." Although plaintiff was aware for over a decade that she had infertility problems, it wasn't until December 2000 when it was made certain to her through an x-ray that she had a malformed T-shaped uterus, caused by embryonic DES exposure, and maintaining a pregnancy was doubtful. Defendant Eli Lilly correctly cites *Albers* in raising the issue of whether plaintiff's reasonable medical investigation into her infertility injury meets an objective standard.[64] As Judge Easterbrook makes a point about the plaintiff in *Albers v. Eli Lilly,* "even a rudimentary search would have turned up evidence of wrongdoing." 345 F.3d 644, 645. Here however, not only did plaintiff ask doctors about her infertility injury, medical experts kept diagnosing her uterus as normal, and kept telling her the infertility was due to endometriosis. Before plaintiff is

---

[64] Defendant Eli Lilly and Company's Reply in Support of Its Motion for Summary Judgment

bound by an objective duty to inquiry about a wrongdoing, there must be an injury and the cause of that injury objectively gathered as in *Albers* in order to attach such duty.

Although defendant argues that plaintiff had an "obligation to investigate what caused the injury and whether it was a result of some wrongdoing" with reasonable diligence under all circumstances, a trier of fact could find that plaintiff showed due diligence as her medical records show. Defendant argues that "a reasonable person in plaintiff's shoes—who had already consulted a lawyer once simply because of a risk of developing cancer—would have investigated the cause of the infertility she was actually experiencing."[65] The record before this court demonstrates plaintiff did investigate vigorously, inquiring at one point twice a year, the cause of her infertility. Defendant's conclusion that "plaintiff's failure to conduct a diligent investigation is objectively unreasonable" raises a genuine issue of material fact for a trier of fact to decide.

The issue of when did plaintiff become aware of all three discovery rule elements—injury, cause, and wrongdoing—after a reasonable investigation comes down to how much reliance the plaintiff as a lay person-patient placed on her physicians. *Diamond,* 680 A.2d 364, 372 (D.C. 1996). The District of Columbia requires actual or inquiry notice of a cause of action after the plaintiff has met her duty to act reasonably under the circumstances in investigating matters affecting her affairs." *Id.* at 372. Plaintiff raises several genuine factual disputes as to her reasonableness under the circumstances. A reasonable jury could find plaintiff met her duty. Defendant Eli Lilly and Company, as the moving party, bears a heavy burden here, for summary judgment after discovery "may be granted on the basis that the action is time-barred only when it appears from the face of the complaint that the relevant statute of limitations bars the action." *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1115 (D.C.Cir.1985).

---

[65] *Id.*

**C. Choice of Law**

Federal Jurisdiction is based on the diversity of citizenship between the parties. This Court must apply District of Columbia choice of law rules to determine which state's substantive law will be applied to this dispute. *See Klaxon v. Electric Mgf. Co.* 313 U.S. 487 (1941). Under District of Columbia "governmental interest" approach to conflict of law issues, the correct choice of law depends on analysis of the respective interests of the states involved. *Estrada v. Potomac Elec. Power Co.,* 129 F.3d 143, 148 (D.C. Cir. 1997). However, the established rule states District of Columbia courts will consider a statute of limitation case as a procedural matter, "governed by the law of the [filing] forum." *Kaplan v. Manhattan Life Insurance Co.,* 109 F.2d 463, 465-466 (D.C. Cir. 1939) *followed by Bell v. Kelly Motor Lines, Inc.* 95 F.Supp. 682 (D.D.C. 1951); *see also A.I. Trade Finance v. Petra Int'l Banking Corp.* 62 F.3d 1454, 1458 (D.C. Cir. 1995) ("Looking to the D.C. choice-of-law rules, we see that they treat statutes of limitations as procedural, and therefore almost always mandate application of the District's own statute of limitations."). This traditional approach set out in *Kaplan* was reaffirmed by the District of Columbia Court of Appeals in *May Department Stores v. Devercelli,* 314 A.2d 767, 773 (D.C. 1973), and later the same court acknowledged that the practice of applying the statute of limitations as a procedural matter to all cases filed in the District of Columbia was in line with the Restatement (Second) of Conflicts of Law § 142 (1971). *Hodge v. Southern Railway Co.,* 415 A.2d 543 (D.C. 1980). Defendant states the District of Columbia's analysis of the statute of limitation is ripe for reexamination.

Defendant makes an argument for the District of Columbia to align the *Kaplan* Rule with the revised Restatement (Second), Conflict of Laws § 142 (1988 Rev.). The revision reflects a more modern approach towards statute of limitations treated under choice of law analysis as a

matter of substantive law.  Defendant argues this court should amend the traditional *Kaplan* rule
and resolve statute of limitation conflicts with a state's interest approach cited in the revised §
142, which disapproves using forum's own statute of limitations when (a) maintenance of the
claim would serve no substantial interest of the forum; and (b) the claim would be barred under
the statute of limitations of a state having a more significant relationship to the parties and the
occurrence.  Restatement (Second), Conflict of Laws § 142 (1988 Rev.).

　　　Defendant sites three reasons for reexamining the traditional *Kaplan* rule: 1) the added
and unjustified burden it imposes on local courts because of egregious forum shopping, 2) long
standing tradition by the District of Columbia courts reliance on the Restatement for guidance,
and 3) adoption of the modern view by several highest state courts. (Defendant Memorandum,
pg. 19-21).  Although the District of Columbia has approached its time limitation as a procedural
matter while acknowledging the previous Restatement provision, there is no indication of any
change from the current approach.  *Nix v. Hoke,* 139 F.Supp.2d 125, 132, n. 4 (D.D.C. 2001)
("Because the District of Columbia treats the statute of limitations as a procedural issue rather
than a substantive one, the law of the forum state applies, as it does with respect to all procedural
matters.").  The defendant, however, erroneously misstates the notion that the "District of
Columbia Court of Appeals relied on the 1971 version of § 142 of the Restatement in support of
its precedent of treating the statute of limitations as a procedural issue." (Defendant
Memorandum, pg. 20).  While defendant cites *Hodge* as support for this conclusion, defendant
ignores the fact that *Hodge* listed three previous decisions by the District of Columbia Court of
Appeals that adopted, affirmed, and reaffirmed the traditional approach. *Hodge,* 415 A.2d at 545.

　　　Defendant makes the argument that "the 1988 [Restatement] revisions to § 142 were a
response to the growing trend away from treating statutes of limitations as procedural, in light of

the widespread criticism" of "egregious forum shopping" by plaintiffs. (Defendant

Memorandum, pg. 19, citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 779 (1984).

While defendant asks this court to pioneer a path towards a more narrow choice of law analysis

to the forum's statute of limitation approach, that is not the role for this federal court. This court

must faithfully apply the same law the District of Columbia courts would apply if this case was

presently before them. This court takes "the law of the appropriate jurisdiction as [found]; and

we leave it undisturbed." *Tidler v. Eli Lilly and Co.,* 851 F.2d 418, 425 (D.C. Cir. 1988)

("Absent some authoritative signal from the legislature or the [state courts], we see no basis for

even considering the pros and cons of innovative theories...We must apply the law of the forum

as we infer it presently to be, not as it might come to be."). The decision to approach a forum

choice of law statute of limitation analysis as a substantive matter—applying a different forum's

statute of limitation time limit—is best left to the District of Columbia Court of Appeals.

### IV. Conclusion

For the foregoing reasons, the Court concludes that defendant is not entitled to summary

judgment in accordance with this memorandum opinion. Plaintiff raises genuine issues of

material fact as to when all three elements to the discovery rule were present. Although

plaintiff's infertility injury may have persisted for a decade prior to her filing this suit, the cause

of the injury was believed to be endometriosis, unrelated to her DES exposure in utero.

Although plaintiff was aware that being exposed to DES may cause health problems, she raises

genuine issues of material fact as whether a connection existed between the infertility injury, and

the cause of that injury being attributed to DES. As Judge Green put it best, rare will be the case

where several elements for a cause of action may not be evident at once. This is one such case.

Defendant Eli Lilly and Company, as the moving party, did not prove there are no genuine issues of material fact. In examining the record, this court must view all inferences in the light most favorable to the non-moving party. The U.S. Court of Appeals for the District of Columbia Circuit in *Shields v. Eli Lilly and Co.* directed *this* court "to consider the cumulative effect of the evidence, and to grant all reasonable inferences to the nonmoving party."[66] Only after finding no "significant probative" evidence tending to support the complaint can this court grant summary judgment.[67] The record taken as a whole would lead a trier of fact to find for the nonmoving party because all three elements for a cause of action in order to accrue under the District of Columbia statute of limitations were not present until December 2000. Plaintiff filed her claim in January 2003, well within the 3-year time limit.

For the foregoing reasons, the Court concludes that defendant is not entitled to summary judgment in accordance with this memorandum opinion. The court will issue a separate order consistent with this opinion.

_____

Signed by Royce C. Lamberth,
United States District Judge

Date: March 11, 2005

---

[66] 895 F.2d 1463, 1465 (D.C. Cir. 1990)
[67] *Id.* quoting *Anderson,* 477 U.S at 249-50, *supra.*