**EXHIBIT 19**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHRISTINE M. ROBERGE** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | )    Civil Action No. 03-CV-01008 (RCL) |
| | ) |
| **ELI LILLY AND COMPANY** | ) |
| | ) |
| **Defendant** | ) |

## MEMORANDUM OPINION

This matter comes before the court on defendant's motion for summary judgment. Upon consideration of the parties' filings, the applicable law and the facts of this case, this Memorandum Opinion finds that the defendant's motion for summary judgment should be GRANTED as a matter of law having demonstrated that plaintiff's cause of action is barred by the three-year statute of limitations under the District of Columbia discovery rule.

### I. Introduction

Plaintiff Christine M. Roberge brings a products liability action against defendant Eli Lilly and Company asserting four counts for negligence, strict liability, breach of warranty, and misrepresentation, seeking Two Million Dollars ($2,000,000.00) as compensatory damages, plus costs. Specifically, she alleges embryonic exposure to DES, on or about 1955 or 1956 to the prescription drug diethylstilbestrol (DES). As a result of plaintiff's exposure to DES in utero, she allegedly suffered injuries, including, but not limited to, uterine and cervical malformations with resulting miscarriages, ectopic pregnancies and infertility, incurred medical expenses for care and treatment, and suffered physical and mental pain and suffering. Plaintiff Christine M. Roberge Complaint ("Complaint"), at No. 3, 4. Defendant Lilly states that it did manufacture,

1

sell certain dosages of DES, as well as distribute DES in the District of Columbia. Lilly also states that it is doing business in the District of Columbia, that the U.S. Food and Drug Administration ("FDA") is headquartered in the District of Columbia, and that the FDA approved Lilly's sales of DES and declared that the drug was generally recognized as safe by experts in the field for the uses at issue here. Defendant Eli Lilly and Co.'s Answer to the Complaint ("Defendant's Reply"), at No. 2, 8. This lawsuit was filed on April 22, 2003.

## II. Background

Plaintiff Christine M. Roberge was born in Schenectady, New York on May 3, 1956. Transcript of Christine M. Roberge Deposition ("Roberge Tr.") at 5. Plaintiff attended Maria College in Albany, New York, studying to be a medical office assistant, receiving an Associate's Degree in Applied Science. During her two years in college, she studied theology, English, Biology, and medical terminology. Roberge Tr. at 14-16. After graduating in 1978, she began her career as an office assistant at the first of two obstetrics and gynecology medical offices. The first medical practice consisted of four doctors—Brown, Cioffi, Seftel, and Soni. Some of her responsibilities during her eight years at the first OB/GYN medical practice included checking patients, making up their charts, and scheduling surgery. Roberge Tr. at 16-17. Plaintiff changed jobs in 1988, and began working for the medical offices of Drs. Linda Leavenworth and Frederick Lea, both OB/GYN practitioners. Plaintiff worked at this medical office through November of 1993. In both instances, plaintiff's medical working colleagues were also her OB/GYN personal doctors. Roberge Tr. at 19, 30, 69.

Plaintiff first became aware in the late 1970's that her mother allegedly took diethylstilbestrol (also known as "DES") during her pregnancy with her. Complaint at No. 3 and Plaintiff Christine M. Roberge's Answers to Defendant Eli Lilly and Co.'s First Set of

Interrogatories ("Interr.") at No. 10. Plaintiff states that she became aware about the ill effects of

DES when she first sought gynecological examinations from one of the OB/GYN physicians

who worked in her office.[1]  Dr. Soni told plaintiff "that there was some atypical changes on my

cervix and wanted to know if I could find out if my mother had taken DES." Roberge Tr. at 28.

The plaintiff asked her mother whether or not she had taken the DES during her pregnancy, and

she responded affirmatively.  Dr. Soni explained DES could contribute to cervical cancer and

that plaintiff needed to be diligent in having yearly Pap smears. Roberge Tr. at 30.  Ms. Roberge

never contracted cancer.[2]

     Plaintiff married in 1984 and both she and the husband began planning on having a

family a few years into the marriage.  Plaintiff was unable to become pregnant right away and

after a year of trying to have a baby, the couple sough treatment from Dr. Fouad A. Sattar.

Roberge Tr. at 63.  Dr. Sattar performed a postcoital test and hysterosalpingogram ("HSG") in

the fall of 1986, when plaintiff was 30 years old.[3]  The medical imaging report done at the

request of Dr. Sattar states a "normal appearing hysterosalpingogram."[4]  In the spring of 1987,

Ms. Roberge became pregnant, but upon examination later that summer, Dr. Sattar diagnosed

---

[1] Although plaintiff states that she received gynecological examinations in her teens and early twenties due to DES cancer scare (1976-1984), we do not have an exact date as to when plaintiff first received medical treatment from Dr. Soni, an OB/GYN specialist who worked in plaintiff's medical office. Roberge Tr. at 17.  Plaintiff refused to give defendant the identity by name and address of each physician that has rendered any medical examination. Interr. at 14.  However, we do know that plaintiff began working for the medical offices of Dr. Soni in 1978, at age 22.

[2] Plaintiff Christine M. Roberge's Opposition to Defendant Eli Lilly and Co.'s Motion for Summary Judgment ("Roberge Opp."), at No. 3.

[3] A postcoital test analyzes the cervical mucus to determine its elasticity and drying pattern.  The test may be performed on a patient if she is ovulating, her fallopian tubes are not blocked, and her partner's sperm are normal. A problem with the cervical mucus may contribute to infertility. HSG is an X-ray test that examines the inside of a uterus and fallopian tubes and the surrounding area. It often is done for women who are unable to become pregnant (infertile). See http://my.webmd.com/hw/womens_conditions/aa16829.asp; see also http://my.webmd.com/hw/infertility_reproduction/ux1259.asp, last visited Jan. 31, 2005;

[4] Plaintiff Christine M. Roberge's Opposition and Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant Eli Lilly and Company's Motion for Summary Judgment ("Roberge Opp. and Mem."), Roberge Medical Records at Appendix 3 ("Roberge Med. Rec."), Report from Dr. John J. Gorman, November 21, 1986

plaintiff as having miscarried for the first time.[5]  Plaintiff continued to seek medical treatment from Dr. Sattar, being diagnosed with infertility in April 1988.  Unfortunately, two months later, plaintiff once again miscarried for the second time.  Interr. at No. 13.  Plaintiff states these pregnancy losses were not a concern at all to her.  She consulted with Dr. Sattar about becoming pregnant again, being told to wait a couple of months before trying.  After this second pregnancy loss, plaintiff insists she did not undergo any immediate exam or treatment to try to explain what had happened, or what her chances would be of having a successful pregnancy in the future. Roberge Tr. at 69

Although she was receiving medical attention from Dr. Sattar in 1988, plaintiff began to visit with another OB/GYN, Dr. Linda Leavenworth.  Dr. Leavenworth was also one of two doctors that Ms. Roberge worked for from 1988-1993, as an office staff member in this obstetrical and gynecology medical practice.  Plaintiff was working for Dr. Leavenworth at the same time she was a patient.  Roberge Tr. at 101.  Previously, plaintiff had worked for eight years at another OB/GYN office checking in patients, making up their charts, and scheduling surgery.  Id. at 17, 19, and 69.  Plaintiff saw medical records of other patients who were DES exposed, while working for an OB/GYN office.  Id. at 112.  Plaintiff states she never talked to the office doctors about what might have caused her pregnancy losses.  Id. at 101.

Dr. Leavenworth diagnosed plaintiff with a right ectopic pregnancy in December of 1988, requiring right partial salpingectomy surgery.[6]  Interr. at No. 13, 15.  In June of 1989, Ms. Roberge underwent a second HSG performed by Dr. Leavenworth.  The radiological report

---

[5] See Roberge Med. Rec., Operative Record of Christine M. Roberge, from Suction Dilation and Curettage operation performed by Dr. Sattar, surgeon and anesthetist, Jul. 27, 1987.

[6] "An ectopic pregnancy occurs when a fertilized egg is implanted outside the uterus, typically in one of the fallopian tubes. If [ ] not recognized and treated in time, the embryo will grow until it causes the tube to rupture, resulting in severe abdominal pain, bleeding, and sometimes even death."
http://www.babycenter.com/refcap/pregnancy/pregcomplications/229.html].  It appears from the plaintiff's medical record that her right ectopic pregnancy required the partial removal of her fallopian tube.  Interr., at No. 15.  See also Roberge Med. Rec., Radiological Report, Emerson Hospital, June 16, 1989 ("Emerson Report")

indicates that the "uterus [was] not well filled for evaluation."[7] Plaintiff testified that after three

pregnancy losses (two miscarriages, one ectopic pregnancy), she was concerned, stressed, and

upset. Roberge Tr. at 75. Dr. Leavenworth encouraged plaintiff to move on and continue

trying. As her personal physician and OB/GYN office mate, she recommended Ms. Roberge

seek treatment from a fertility specialist. *Id.* Ms. Roberge began seeing Dr. Selwyn Oskowitz, a

reproductive endocrinologist, several months later.

Dr. Selwyn Oskowitz performed tests on Ms. Roberge in order to find out what had

caused the repeated pregnancy losses.[8] Once all the tests relating to plaintiff's repeated

miscarriages were completed, Dr. Oskowitz told Mr. and Mrs. Roberge that the results returned

as normal. Dr. Oskowitz wrote, "although two miscarriages have occurred, we do not have an

explanation on which to base any active treatment (for the miscarriage)."[9] Despite the fact that

plaintiff wrote in her medical history chart that she had been exposed to DES, Dr. Oskowitz did

not say anything to plaintiff about DES or mention the term. Roberge Tr. at 78. One possible

problem considered by the infertility specialist related to Mr. James Roberge's sperm. He was

referred to urologist.

At the same time that Ms. Roberge received Dr. Oskowitz's letter on September 1, 1989,

plaintiff's history indicate she had her last menstrual period on September 2, 1989.

Unfortunately once again, Ms. Roberge was diagnosed with a left ectopic pregnancy on October

1, 1989 requiring a linear salpingostomy. Interr. at No. 13, 15. Dr. Oskowitz operated on Mr.

Roberge for her October 1989 ectopic surgery. In the Discharge Statement connected with the

ectopic pregnancy surgery that Dr. Oskowitz completed, his diagnosis at the time was the

following: "F tubal isthmic ampullary pregnancy, and diethylstilbestrol exposure." Transcript of

---

[7] Emerson Report
[8] Roberge Med. Rec. (Letter from Oskowitz, M.D. to Roberge, Mr. & Mrs., Sept. 1, 1989)
[9] *Id.*

Dr. Selwyn P. Oskowitz, M.D. ("Oskowitz Tr.") at 28. According to Dr. Oskowitz, the reason why he included "diethylstilbestrol exposure" as a secondary diagnosis was because "[i]t was known at that time that DES exposure carried a risk factor for ectopic pregnancy." *Id.*

On January 12, 1990, Dr. Oskowitz performed a third "HSG" of Ms. Roberge and discussed the results of the HSG with her. Roberge Tr. 78. Dr. Oskowitz told plaintiff that she had a slight change in her uterus. *Id.* Plaintiff was advised by Dr. Oskowitz that in utero DES exposure had some effect on the development of her reproductive tract, diagnosing Ms. Roberge with a uterus that was T-shaped. Interr. at No. 10(b), 13(g), Oskowitz Tr. at 20-21 *and* Roberge Tr. at 79. Plaintiff asked Dr. Oskowitz what he meant by a slight change in her uterus, recalling the infertility specialist didn't go into details but did tell her "there was a change and that we would go on to the next cycle of IVF (in vitro fertilization)." Roberge Tr. at 79. Plaintiff states Dr. Oskowitz said "it shouldn't have any effect on future pregnancies." *Id.* at 78. However, the plaintiff recalls Dr. Oskowitz saying that the uterus had the effects of DES but she did not know what DES effects on the uterus were. *Id.* at 79. Ms. Roberge says she was "concerned with the fact that would this have any impact on getting pregnant again." *Id.*

As Dr. Oskowitz recalls, it was his view that the slightly T-shaped uterus as he described it to Ms. Roberge was the cause of the first trimester pregnancy losses. Oskowitz Tr. at 20-21. Dr. Oskowitz states, "I would have confirmed with [plaintiff] that the DES has had an impact on her uterus, and that it has and will influence the prognosis of having a term pregnancy." *Id* at 33. According to Dr. Oskowitz, the prognosis for becoming pregnant was negative, making IVF treatments more difficult, more prolonged, more complicated, and "will increase the chance that she'll have no term pregnancy." *Id.* Despite these discussions with Dr. Oskowitz, Ms. Roberge did nothing to find out more about DES. Roberge Tr. at 90. In fact, at no time did Ms. Roberge

6

do any research regarding DES. *Id.*at 116. Plaintiff states that "despite his deposition testimony, Dr. Oskowitz's own progress notes of July 26, 1990—which is after Ms. Roberge's HSG—states that there is 'no identifiable cause' for Ms. Roberge's [ ] miscarriages and two ectopic pregnancies" suggesting other factors and possible problems as the culprits for her pregnancy losses. Roberge Opp. and Mem. at No. 7.

Plaintiff began IVF treatments in 1990. On September 12, 1990, Plaintiff received a letter from Dr. Oskowitz informing her "We have uncovered an area in your immune testing that provides a possible avenue for treatment to avoid the rate of miscarriages." [10] Dr. Oskowitz recommended a "very specialized [medical] unit" that deals with this type of treatment.[11] On December 12, 1991, the Pregnancy Evaluation and Treatment Program located at the Foundation for Blood Research/Maine Medical Center informed plaintiff that she and her husband had been "accepted as a candidate couple to be offered" the white blood cell ("WBC") immunotherapy treatment that Dr. Oskowitz had recommended.[12] According Dr. Richard Doherty, they had been accepted into the "program because no cause could be found for your repeated miscarriage."[13] According to the Pregnancy Evaluation and Treatment Program, "the WBC immunization treatment is potentially beneficial for couples in whom all recognized causes of pregnancy loss...uterine structural abnormalities [ ] have been ruled out."[14]

The Roberges discontinued the IVF treatments within a year, "when my eggs didn't fertilize, I was pretty upset." Roberge Tr. at 94. Although they discontinued IVF treatments, they did not stop trying to get pregnant. Ms. Roberge had three chemical pregnancies in February 1990, April 1990, and February 1994 all diagnosed by Dr. Linda Leavenworth. Interr.

---

[10] Roberge Med. Rec. (Letter from Oskowitz, M.D. to Roberge, Mrs. Christine, Sept. 12, 1990).
[11] *Id.*
[12] Roberge Med. Rec. (Letter from Doherty, M.D. to Roberge, James D. & Christine M., Dec. 13, 1991).
[13] *Id.*
[14] *Id.*

at No. 13. Ms. Roberge went back on birth control pills to help regulate her irregular menses. Roberge Tr. at 94. In 1993, Ms. Roberge and her husband adopted their first child. They adopted another child in 1999. *Id.* at 14.

From 1988 until 1993, during which time Ms. Roberge was attempting to get pregnant she worked at the offices of Dr. Linda Leavenworth and Dr. Frederick Lea. Dr. Leavenworth was also Ms. Roberge's treating gynecologist. Despite working with OB/GYNs, Ms. Roberge never discussed her pregnancies losses or what may have caused them with the doctors with whom she worked. *Id.* at 101. However, plaintiff argues that she was getting mixed messages regarding her reproductive problems—from low sperm count on the part of her husband, to being DES exposed and having a T-shaped uterus, to finally hearing such reproductive problems were due to an immunological deficiency. She was therefore reasonably in the dark regarding the DES connection. Ms. Roberge states "[d]efendant has not provided a single piece of evidence that the plaintiff had any actual cognition, realization, suspicion or appreciation of the defendant's wrongful conduct nor of the existence of DES litigation until the year 2002." Roberge Opp. at No. 2. Finally, plaintiff argues there is no evidence she "possessed any facts or legal familiarity, training or experience, which could have given her insight on the matter." Roberge Opp. and Mem. at Introduction 3. Plaintiff says she believed "the drug saved her life."[15]

### Standard of Review

A court may dispose of a case on summary before trial only when examination of the record as a whole reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must inquire whether "there are any genuine issues that properly can be resolved only by a finder of fact because they

---

[15] Roberge Opp. at No. 2.

may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Before trial, a party must be able "to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In examining the record, the court must view all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, Rule 56 also requires the non-moving party to "go beyond the pleadings by [entering evidence] showing there is a genuine issue for trial." 477 U.S. at 324. If the moving party proves no genuine issues of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt" as to an issue for trial. Where the record taken as a whole could not lead a trier of fact to find for the nonmoving party, there is no genuine issue for trial. 475 U.S. at 586.

### III. Discussion

#### A. Elements for the Discovery Rule

Products liability claims in the District of Columbia must be brought within a three-year period of limitation "from the time the right to maintain the action accrues." D.C. Code § 12-301(8) (2001). *Smith v. Brown & Williamson Tobacco Corp.,* 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998). Plaintiff commenced this lawsuit on April 22, 2003. Defendant Lilly states that if Ms. Roberge's cause of action arose any time prior to April 22, 2000, her claims are time-barred under the District's statute. In order to determine when the statute of limitation commences, the parties agree that a three-prong "discovery" rule applies to this action under District of Columbia law, although the parties dispute when all the elements for the rule became actionable. Where the discovery rule is applicable, in order for the cause of action to accrue, "one must know (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of

9

some evidence of wrongdoing. *Bussineau v. President and Directors of Georgetown Coll.,* 518 A.2d 423, 425 (D.C. 1986). The "discovery rule" determines when "the clock begins to tick" on the statutory three-year limitation. *Albers v. Eli Lilly and Co.,* 257 F. Supp. 2d 1147, 1149 (N.D. Ill.E.D. 2003), *affirmed,* 354 F.3d 644 (7th Cir. 2004) (C.J. Easterbrook) *per curiam.*

As the court in *Bussineau* stated, "a cause of action is said to accrue at the time injury occurs." *Bussineau,* 518 A.2d at 425. However, in reconfirming its decision in *Bussineau* per curiam, the District of Columbia Court of Appeals noted the discovery rule applies in cases "where the relationship between the fact of injury and the alleged tortuous conduct is obscure when the injury occurs," some evidence of wrongdoing may be required. *Diamond v. Davis,* 680 A.2d 364, 379, 380 (D.C. 1996) quoting *Bussineau,* 518 A.2d at 425; *e.g., Burns v. Bell, 409 A.2d 614,* 617 (D.D.C. 1979); *Kelton v. District of Columbia,* 413 A.2d 919, 921 (D.C. 1980); *Jones v. Rogers Memorial Hosp.,* 442 F.2d 773 (D.C. Cir. 1971); *Grigsby v. Sterling Drug, Inc.* 428 F. Supp. 242, 243 (D.D.C. 1975), *aff'd* 543 F.2d 417 (D.C. Cir. 1976), *cert denied,* 431 U.S. 967 (1977); *Dawson* v. *Eli Lilly and Co.,* 543 F. Supp. 1330 (D.D.C. 1982).

As the court in *Bussineau* pointed out, it was Judge Joyce Hens Green in *Dawson* who analyzed previous decisions by the District of Columbia Court of Appeals to resolve the issue of when a cause of action accrues under the discovery rules. *Bussineau,* 518 A.2d at 426, 428; *Dawson,* 543 F. Supp. at 1333; *see also Reeves v. Eli Lilly,* Civil Action No. 03-00237 (RCL). The District of Columbia Court of Appeals agreed with Judge Green that various cases interpreting the discovery rule "may not have parsed the issue with clarity and precision" and the court also agreed with one of her three factual situations—that the District of Columbia courts would adopt the "some evidence of wrongdoing" rule. *Bussineau* at 428.[16]

---

[16] *Contra Albers v. Eli Lilly and Co.,* 257 F. Supp 2d 1147, 1150 (N.D. Ill. E.Div. 2003) ("Judge Joyce Hens Green's rejection of summary judgment on statute of limitations grounds is two decades old, and the massive and highly

The court in *Diamond* furthered the discovery rule by establishing the "inquiry notice" standard of "some evidence of wrongdoing" and adopting an objective standard of care of actual or inquiry notice with a duty on the plaintiff to investigate:

> [M]atters affecting her affairs with reasonable diligence under all of the circumstances. Once the plaintiff actually knows, or with exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is bound to file her cause of action within the applicable limitation period, measured from the date of her acquisition of the actual or imputed knowledge.

*Diamond,* 680 A.2d at 381. The court in *Diamond* fashioned an analytical framework for courts to follow its "notice" standard. At its foundation, the court stated the statute of limitation clock begins to tick for the plaintiff when she has either actual knowledge or is charged with knowledge of her cause of action; a plaintiff may be charged with knowledge because she has a duty to investigate and determine a possible cause of action; and "if a plaintiff has not acquired actual knowledge of a cause of action only because of [her] failure to meet that duty to investigate, the plaintiff is nevertheless charged with that knowledge." *Diamond,* at 372.

According to the court, there were two types of notice: "actual notice" which the plaintiff possessed, and "inquiry notice" which the plaintiff "would have possessed after due investigation." *Diamond,* 680 A.2d at 372. "Actual" and "inquiry" notice in tandem refer to the start of the limitations period for a cause of action. Either notice acquired by the plaintiff at a particular time will be a question of fact. However, "once either actual or inquiry notice is present…the statute of limitations begins to run as a matter of law." *Id.* at 372. *See also Albers v. Eli Lilly and Co.,* 257 F. Supp. 2.d at 1151. ("Inquiry notice is 'that notice which a plaintiff would have possessed *after* due investigation.' Reasonableness is of course a wholly objective

publicized developments that have taken place in the field in the interim render that case's analysis of the due diligence issue very much out of date."), *affirmed* 354 F.3d 644, (7th Cir. 2004) (C.J. Easterbrook), *per curiam.* However, while the district court criticized Judge Green for her analysis of due diligence, the D.C. Court of Appeals in *Bussineau,* quoted extensively in *Albers,* adopted and affirmed Judge Green's approach to the "some evidence of wrongdoing" element under the discovery rule. The Seventh Circuit also applied the "some evidence of wrongdoing" element cited by *Bussineau* and affirmed in *Diamond.*

standard."), *quoting Diamond*, 680 A.2d at 372 (emphasis added by the court), *affirmed* 354 F.3d 644, 645 (7th Cir. 2004) ("The line of [plaintiff's] argument, if adopted, would effectively abolish the D.C. objective rule allowing the imputation of evidence that would have been gathered from a reasonable search and would convert the standard to an entirely subjective one."). As Judge Ferren stated, the discovery rule in the District of Columbia, while "effectively creat[ing] a duty of inquiry," does not require a plaintiff to be aware of "all the essential elements of the claim" to be placed on notice.[17] In concurring with the court's opinion in *Diamond*, Judge Ferren stated a plaintiff's claim under the discovery rule begins its three-year limitation when she has actual or inquiry notice based on unconfirmed information or insubstantial evidence—hints, suspicions, and rumors—that through reasonable diligence, could lead the plaintiff to some evidence of a suspected wrongdoing, even if the wrongdoing was not clearly defined. *Diamond*, at 393.

**B. Defendant's evidence demonstrates plaintiff's cause of action is time barred**

Defendant Eli Lilly argues that it is entitled to summary judgment as a matter of law because the plaintiff's claims are barred by the applicable statute of limitations. Although plaintiff alleges that DES caused her several miscarriages and chemical pregnancies, infertility, two ectopic pregnancies, T-shaped uterus, the defendant states these injuries were brought to her attention well before 2000. However, the plaintiff argues a reasonable juror could find that she received "mixed messages" about the cause of her pregnancy problems. Christine Roberge states the defendant "has not provided a single piece of evidence that [she] had any actual cognition, realization, suspicion or appreciation of the [d]efendant's wrongful conduct. Roberge Opp. at No. 1. Plaintiff also argues that "Lilly does not put forth a single fact" that Ms. Roberge's doctors "ever raised a hint suggesting wrongful conduct...or even that DES causes infertility."

---

[17] *Diamond*, 680 A.2d at 389 (Ferren, J. *concurring in the result and dissenting in part*) ("The concept of inquiry notice under the discovery rule...means that a potential plaintiff may be legally accountable for investigating a possible claim *before* learning "some evidence of wrongdoing.") (court emphasis) *Id.* at 390.

Roberge Opp. and Mem. at 13. In her statement to the court, plaintiff states she "neither saw nor heard anything to put her on [ ] notice." *Id.* "Ms. Roberge contests and denies she had any notice, hint, or suspicion that DES caused her infertility until recently." *Id.* at 16.

### 1. Plaintiff knew, or by due diligence should have known of injury and cause in fact

After graduating from Maria College in Albany, New York with an Associate's Degree in Applied Science, she began her medical office assistant career. In 1978, plaintiff worked for the OB/GYN medical offices of Drs. Brown, Cioffi, Seftel, and Soni. While working for OB/GYN physicians, plaintiff sought gynecological examinations from Dr. Soni. Dr. Soni placed the plaintiff on notice that because she had been a DES baby, she would be susceptible to health risks, such as cervical cancer. This diagnosis came about because plaintiff was told there were some atypical changes on her cervix. An objective juror would conclude that a medical assistant working for OB/GYN physicians would have actual notice or have been placed on inquiry notice that DES could be a potential health risk. In fact, plaintiff was told by Dr. Soni that plaintiff needed to be diligent in having yearly Pap smears.

Several years later, plaintiff was told after repeated miscarriages and problematic pregnancies that she had a slight change in her uterus. In January of 1990, plaintiff was advised by Dr. Oskowitz after her third HSG test that in utero DES exposure had some effect on the development of her reproductive tract, diagnosing Ms. Roberge with a uterus that was T-shaped. Plaintiff admits Dr. Oskowitz told her the uterus had the effects of DES but she did not know what DES effects on the uterus were. Although she was concerned after hearing this information for her chances of getting pregnant again, Ms. Roberge did not find out more about DES. Although plaintiff argues that she had received other mixed messages as to the cause of her miscarriage, infertility and problematic pregnancies, a reasonable juror would conclude that

13

plaintiff had been placed on notice as to her injury and the cause in fact given the hints and suspicions raised by her medical specialists.

Plaintiff and her husband received information and advice from several physicians throughout the 1990s, including her own office employer Dr. Leavenworth, as to what could be the cause of her infertility. From low sperm count on the part of plaintiff's husband to seeking IVF treatments from an infertility specialist and also immunological exams, plaintiff was diligent to investigate various avenues that could explain her pregnancy losses, except finding out how being exposed to DES could affect her. Although she worked for several years at two OB/GYN offices, plaintiff states she neither saw nor heard anything to put her on notice. However, the evidence demonstrates that while working for Dr. Leavenworth from 1988-1993, plaintiff saw medical records of other patients who were DES exposed. A reasonable juror would conclude given these facts that plaintiff had the duty to investigate and determine a possible cause of action to her injury, and even if plaintiff did not acquire actual knowledge of her cause of action, she failed to meet her duty to investigate given her work experience. Therefore, plaintiff is nevertheless charged with that knowledge.

### 2. Plaintiff knew, or by due diligence should have known of evidence of wrongdoing

This case is analogous to *Albers v. Eli Lilly and Company.*[18] The plaintiff, Katherine Albers, had conceded she knew her malformed uterus was attributed to being exposed in utero to DES. She was diagnosed with a T-shaped uterus and was told that this uterine anomaly may have been related to her mother's ingestion of DES. *Albers,* 257 F. Supp. 2d at 1149. However, Ms. Albers denied she had some evidence of wrongdoing, discovered only after reading in a newspaper advertisement placed by an attorney about DES. Ms. Albers argued she lacked this

---

[18] 257 F. Supp. 2d 1147, *affirmed* 354 F.3d 644 (7th Cir. 2004), *per curiam*

information and had no reason to suspect any wrongful conduct on the part of the defendant prior to reading the newspaper.

Even though the district court took her word that she had no actual knowledge to satisfy the third prong of the discovery rule under Rule 56, the court did find that she had been placed on inquiry notice, required to meet her duty and act reasonably given the facts in investigating matters affecting her affairs. As the district court pointed out, "She engaged in no follow-up inquiry at all into DES, into why it caused the serious deleterious effects that it did...[e]ven the most modest of such inquiries (in lay terms) would quickly have put [plaintiff] onto information that clearly satisfied" any evidence of wrongdoing required by the discovery rule. *Albers,* at 1150-51. As Judge Easterbrook pointed in affirming the district court decision, a plaintiff has an objective duty of care to investigate and find some evidence of wrongdoing.[19]    Judge Easterbrook found a reasonable jury would conclude that a person with a serious medical condition, such as having a T-shaped uterus injury rendering her infertile and knowing its cause, "would investigate to learn whether wrongful conduct played a role." *Id.* at 645. Although plaintiff subjectively argues she was in the dark as to her reproductive problems, a reasonable juror would conclude plaintiff would have shed some light into her health concerns if she had met her duty to investigate.

### 3. Plaintiff was deemed to be placed on inquiry notice

In this case, plaintiff argues *Albers* is neither persuasive nor binding. Plaintiff distinguishes her case from that of Katherine Albers by arguing Ms. Albers stipulated and conceded that she knew DES was the cause of her infertility. Christine Roberge contests and denies she had any notice, hint or suspicion that DES caused her infertility. Although plaintiff argues she neither saw nor heard anything to put her on notice, the evidence contradicts plaintiff's assertion.

---

[19] *Albers v. Eli Lilly and Co.,* 354 F.3d 644 (7th Cir. 2004), *per curiam*

Plaintiff worked for many years for OB/GYN doctors, and after being told that one possibility out of several others could be the cause of infertility, she never investigated how being a DES baby could impact her chances of being pregnant. Plaintiff testified that after three pregnancy losses (two miscarriages, one ectopic pregnancy), she was concerned, stressed, and upset. A reasonable juror would conclude given the information provide to plaintiff by Dr. Oskowitz, her professional environment, and the various measures she and her husband went through to find answers as to her pregnancy concerns, these facts created a duty of inquiry. Dr. Oskowitz stated when he examined the plaintiff in 1989 and included DES as a secondary diagnosis to her ectopic pregnancy, "it was known at that time that DES exposure carried a risk factor for ectopic pregnancy." Oskowitz Tr. at 28. Plaintiff was advised by Dr. Oskowitz that in utero DES exposure has some effect on the development of her reproductive tract, being diagnosed with a uterus that was T-shaped. Despite this information, Ms. Roberge did nothing to find out more about DES because she argues other physicians were giving her mixed messages regarding her reproductive problems. As Judge Ferren articulated in *Diamond,* "through further investigation, eventually [plaintiff] will learn sufficient details of a claim to justify filing suit before the applicable limitation period expires." *Diamond,* 680 A.2d at 391. Here, a reasonable juror would conclude that Ms. Roberge, knowing she was an injured person, caused by DES exposure, and having been placed on inquiry notice, was deemed to have legal notice of the claim, and the statute of limitations under the District of Columbia discovery rule began to run long before 2000, and therefore plaintiff's claim has expired.

## IV. Conclusion

For the foregoing reasons, the Court concludes that defendant is entitled as a matter of law to summary judgment in accordance with this memorandum opinion. Plaintiff neither has

the facts nor the law on her side. The District of Columbia discovery rule requires that a claim accrues when one knows, or by the exercise of reasonable diligence should know—based on evidence as insubstantial as hints, suspicions, and rumors—of an injury, its cause in fact and some evidence of wrongdoing. The D.C. law establishes an objective rather than a subjective standard. Defendant Eli Lilly and Company, as the moving party, proved plaintiff Christine Roberge was on notice of her cause of action more than three years before filing suit. In examining the record and the evidence, this court must view all inferences in the light most favorable to the non-moving party. After finding evidence acknowledged and conceded by the plaintiff that demonstrates her claim is barred by the statute of limitations under the District of Columbia discovery rule, this court grants summary judgment. The record taken as a whole would lead a trier of fact to find for the moving party because all three elements for a cause of action began to accrue under the District of Columbia statute of limitations prior to April 22, 2000. Plaintiff filed her claim in April 22, 2003, well after the 3-year time limit had expired.

For the foregoing reasons, the Court concludes that defendant is entitled to summary judgment in accordance with this memorandum opinion. The court will issue a separate order consistent with this opinion.

_____

Signed by Royce C. Lamberth,
United States District Judge

Date: March 11, 2005

17